UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TERESA O'SULLIVAN,

      Plaintiff,

      v.

STRATEGUS RG, INC., f/k/a ROGERSGRAY,
INC., d/b/a ROGERSGRAY and BRP GROUP
INC.,

      Defendants.

Civil Action No: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

      This is an action for employment discrimination and retaliation. In 2015 Plaintiff Teresa O'Sullivan took over the leadership of the struggling, unprofitable Business Insurance division of RogersGray, Inc., an insurance agency based in Southeastern Massachusetts doing business as RogersGray. By every objective measure, Ms. O'Sullivan's performance in this role was exceptional. Among other accomplishments, she helped significantly increase the profitability of her division and turned it into a consistently profitable business unit. She even won a company-wide award for "Personal Leadership" in May 2020.

      But despite her successful job performance, there was something about Ms. O'Sullivan that just did not sit right with RogerGray's top leadership. First, as an older female, Ms. O'Sullivan stuck out like a sore thumb at a business where essentially all of the top executives were significantly younger, and the partnership group calling the shots, led by the powerful 39- and 41-year-old brothers Mike and Dave Robinson, was entirely comprised of men under 50. Second, Ms. O'Sullivan did not act the way RogersGray expected women to act. Assertive and clear in her communications, she violated the unspoken rules of gender at RogersGray, where it was acceptable

for men to be rude and dismissive, yell, and even lose their temper at subordinates, while women could be nothing but deferential. And third, when Ms. O'Sullivan observed RogersGray engaging in potentially unlawful activity, she had the temerity to speak out against it, angering senior management and further contributing to the discriminatory and retaliatory headwinds that endangered her employment.

These three strikes—age, gender, and retaliatory animus—individually and/or collectively, are what ultimately caused Defendant to demote and fire Ms. O'Sullivan in violation of state and federal law. Ms. O'Sullivan now brings this action to seek relief for the severe emotional and financial harms she has suffered as a result of RogersGray's brazen discriminatory and retaliatory actions.

## Parties and Jurisdiction

1.     Ms. O'Sullivan is a female citizen of Massachusetts residing at 11 Old Pottery Lane, Norwell, Massachusetts. Born in 1960, Ms. O'Sullivan is presently sixty-one years old.

2.     Defendant Strategus RG, Inc. "Strategus" is an entity incorporated under the laws of Massachusetts. Prior to July 1, 2021, Strategus was known as RogersGray, Inc., and conducted the business known as "RogersGray."

3.     Defendant BRP Group, Inc. ("BRP") is an entity incorporated under the laws of Delaware. BRP, acting directly and/or through its subsidiaries, acquired RogersGray on or about July 1, 2021. Upon information and belief, BRP's acquisition of RogersGray resulted in a *de facto* merger, rendering BRP liable for the claims set forth herein.

4.     This Court has jurisdiction over Ms. O'Sullivan's claims under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* (the "ADEA"), and Title VII

of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.* ("Title VII") pursuant to 28 U.S.C. § 1331 because those claims arise under the laws of the United States.

5.     This Court has jurisdiction over Ms. O'Sullivan's remaining claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as her ADEA and Title VII claims, under Article III of the United States Constitution, and arise from the same nucleus of operative facts.

6.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred within this District, specifically in the Counties of Barnstable and Plymouth.

7.     Ms. O'Sullivan has complied with all administrative prerequisites to this action. Ms. O'Sullivan timely filed a Charge of Discrimination ("Charge") with the Massachusetts Commission Against Discrimination ("MCAD") and Equal Employment Opportunity Commission ("EEOC") on May 18, 2021.

8.     Ms. O'Sullivan properly withdrew her Charge after 90 days to pursue her claims in court, and thereafter received a Right to Sue letter from the EEOC to pursue her ADEA and Title VII claims in Court.

## Facts

### *Ms. O'Sullivan's Background and Hiring as Director of Commercial Insurance*

9.     Ms. O'Sullivan has over 30 years of experience in the field of commercial insurance. Prior to her service at RogersGray, she held roles at Driscoll Insurance, CNA Commercial Insurance, USF&G, and Aetna. She earned her Chartered Property and Casualty Underwriter ("CPCU") designation and holds an active license to produce insurance in Massachusetts.

10.     Throughout most of her career, Ms. O'Sullivan served as a manager with supervisory responsibilities over direct reports. These included staff responsible for underwriting, processing, accounting, audit, and support.

11.     RogersGray hired Ms. O'Sullivan on September 28, 2015 to serve as Director of Business Insurance. The Business Insurance division at RogersGray is also known as "Commercial Lines," sometimes abbreviated by the initials "BI" or "CL."

12.     RogersGray provides insurance to businesses as well as individuals throughout Cape Cod and Southeastern Massachusetts. It also handles accounts throughout the United States.

13.     At all relevant times, RogersGray operated as a close, family-run business under the leadership of brothers Mike Robinson, the Chairman of the Board, and Dave Robinson, the President and CEO. Prior to January 2014, RogersGray was run by the Robinson brothers' father, Charles.

14.     As the Commercial Lines Director, Ms. O'Sullivan oversaw a large division that was tasked with servicing and maintaining enduring relationships with RogersGray's business insurance customers. Ms. O'Sullivan was also tasked with closely monitoring and continually improving and increasing the efficiency of RogersGray's business insurance operations, all while managing up to 48 reports across RogersGray's local offices.

15.     Each division or department at RogersGray ultimately reports to one of the two Robinson brothers. At all relevant times, Mike Robinson oversaw RogersGray's Sales, IT, Finance, and Marketing/Business Development divisions, while Dave Robinson oversaw the divisions that manage Operations and Human Resources.

16.     Ms. O'Sullivan worked within Operations in Dave Robinson's side of RogersGray. She reported to the Chief Operating Officer (COO), a role that was performed directly by Dave

Robinson when she was hired, and subsequently by Erin Schaaf for most of Ms. O'Sullivan's tenure.

### *Ms. O'Sullivan Successfully Leads the Commercial Lines Division.*

17.    Ms. O'Sullivan's competence, hard work, and dedication earned her positive recognition from her superiors and delivered positive results for her division.

18.    When Ms. O'Sullivan was first hired in 2015, Commercial Lines was achieving revenues of $6.4 million per year and was not profitable as a business unit.

19.    By year-end 2019, under Ms. O'Sullivan's leadership, Commercial Lines' revenues had doubled to $12.3 million. That same year, in 2019, the division recorded a core operating profit margin of 29%.

20.    As of October 2020, Commercial Lines was on pace to exceed its annual targeted revenue and profit goals for 2020. This was a significant accomplishment given the intensely challenging pandemic conditions, including the devastation of the hospitality industry and RogersGray's loss of many small business clients that ceased operations due to the pandemic.

21.    Ms. O'Sullivan's supervisors recognized her strong job performance through their comments in her formal annual performance reviews, and by increasing her compensation.

22.    For example, after her first full year on the job (2016), Ms. O'Sullivan received a merit salary increase, and Dave Robinson wrote in her annual performance review: "You have done a terrific job bringing you[r] job experience and knowledge to R&G. You are making great strides in applying this to the division and improving it in many ways. I am very impressed with the strides you have made in such a short period of time. Keep up the great work!"

5

23.     Ms. O'Sullivan earned another raise in mid-2017 for her contributions to the success of the Commercial Lines division.

24.     In her performance review for 2017, which was completed by Ms. Schaaf, Ms. O'Sullivan was praised for "driv[ing] results in a way that has moved the Commercial Insurance Division to be stable and structured for the future." That review stated that the CL division had "made a major turn to the positive" thanks to Ms. O'Sullivan's "knowledge and contributions." Ms. Schaaf was also highly laudatory of Ms. O'Sullivan's leadership as a manager. Among other things, Ms. Schaaf wrote that "She cares a great deal for her people and would do anything to help them"; that "Teresa is very good with her direct reports and brings them along nicely"; and that "You hold yourself to a very high standard. This has elevated those around you."

25.     In Ms. O'Sullivan's 2018 annual performance review, Ms. Schaaf noted that Ms. O'Sullivan had worked "long, hard hours" and had been "amazing" for having gotten "so much accomplished" even though it had been "the craziest [year] for years (from a personnel perspective)." She also noted that Ms. O'Sullivan "cares very much for her team and it shows in her words and actions involving them."

26.     In her performance review for 2019, Ms. Schaaf wrote that Ms. O'Sullivan was "highly motivated and always ready to jump in on any initiative or project," and praised her for staying "up to date on emerging topics" and for having "tremendous knowledge and experience in this industry, enough so to create wonderful solutions and make strong decisions." She further wrote that Ms. O'Sullivan was "extremely trustworthy" and had her "complete trust."

27.     One of Ms. O'Sullivan's proudest achievements at RogersGray occurred on May 29, 2020 when she received the Excellence in Personal Leadership Award at RogersGray's annual meeting. This honor recognized her for embodying RogersGray's "Core Value" of Leadership. To

be selected for the award, Ms. O'Sullivan first had to be nominated by other employees, and then be chosen from among the nominees by a team of senior managers and directors.

28.     At the annual meeting, which was held remotely due to COVID-19, Dave Robinson introduced Ms. O'Sullivan's award recognition by stating:

> This award nominee inspires excellence in themselves and others. They drive to embrace progress. They're accessible and accountable to our clients, to each other, and to our communities. He or she fosters a positive approach and attitude when making decisions. They're thoughtful to take the right path, not the easy path.

29.     RogersGray then presented a video in which several RogersGray employees provided testimonials praising Ms. O'Sullivan. See YouTube, RogersGray Annual Meeting 56:10–59:31 (May 29, 2020), https://www.youtube.com/watch?v=WRVLSJD5e18. Among many compliments, the employees stated that Ms. O'Sullivan "[led] by example" and was a "wonderful role model"; that Ms. O'Sullivan was "one of the most caring and principled people I have ever had the pleasure to work with"; and that "[She] lives every breath with integrity [and shows] moral excellence, genuine character, and sincere humility."

30.     Roughly three months after receiving this award, Ms. O'Sullivan was demoted on false and pretextual grounds. Shortly thereafter, she was fired.

### *Led By Younger Males, RogersGray's Culture Favors Younger Males' Advancement*

31.     The Robinson brothers, who controlled RogersGray at all relevant times, are about twenty years younger than Ms. O'Sullivan. Mike Robinson is approximately 41 years old, and Dave Robinson is approximately 39 years old.

32.     RogersGray's senior management team of C-suite officers, who reported directly to Mike and Dave Robinson, included only two individuals over the age of 50: Jeff Reilly, Chief Sales Officer (CSO), who is approximately 53, and Jim Lopes, CFO, who is approximately 51.

The other senior managers include individuals in their early to mid-forties, including Lynn Mason-Small, Chief Marketing Officer (CMO); Peter Cullivan, Chief Information Officer (CIO); and Allison McEachern, Chief People Officer (CPO, i.e., the head of HR).

33.     As of Ms. O'Sullivan's termination, the members of RogersGray's ownership group were Mike Robinson, Dave Robinson, John Gaynier, Greg Deems, and David Dunn, of whom Dunn was the only partner over the age of 41. Subsequently, RogersGray promoted five new men under the age of 50 to the level of partner: Jeff Bastien, Jeff Cotto, John Foley, Ryan O'Connell, and John Turco.

34.     In addition, many of the other directors (the same level as Ms. O'Sullivan's position) and managers (one level below) at RogersGray were also substantially younger than Ms. O'Sullivan. For example, Mark Carrick, Director of Business Process, and Amy Fleck, Director of Training & Development, are in their late 30's and/or early 40's.

35.     RogersGray employees openly referred to Ms. O'Sullivan in ways that singled her out for being older. For example, in the summer of 2020, a manager in Commercial Lines informed Ms. O'Sullivan that employees were calling her "Ma T," a pet name used by the employee's step-grandmother.

36.     RogersGray's culture also encouraged the utterance of openly sexist and inappropriate remarks by men that made female employees extremely uncomfortable. For example, in 2020 Ms. O'Sullivan logged in to a Zoom meeting where the male participants were discussing "wives' excuses" for why they could not have sex with their husbands. Without acknowledging Ms. O'Sullivan had logged on, the men proceeded to joke that during the pandemic their wives were complaining that they had to "socially distance" rather than saying "honey, I have a headache."

37.     RogersGray's sexist and ageist work environment was not limited to uncomfortable remarks, as Ms. O'Sullivan observed that it was not uncommon for younger males or younger, attractive females to receive favorable job treatment at RogersGray. On multiple occasions, young, attractive females were hired or promoted without job postings or before other candidates were offered the chance to interview.

38.     For example, on one occasion a male in his mid-thirties complained to Mike Robinson that there were no advancement opportunities at RogersGray. Mike Robinson instructed the COO to demote a female manager in her mid-forties who had been in her position for approximately eight years, and promote the younger male to that position. This female former manager now reports to the younger male.

### *Ms. O'Sullivan Receives Discriminatory Scrutiny Over Her "Communication" Skills*

39.     RogersGray maintains a sexist and hierarchical culture in which women are expected to be deferential and communicate in a manner consistent with gender stereotypes.

40.     Ms. O'Sullivan did not conform to these expectations, so her communication style came under close and discriminatory scrutiny during her tenure at RogersGray.

41.     For example, Ms. O'Sullivan often received feedback in her written performance reviews, which were otherwise overwhelmingly positive, that her communications were too "abrupt" or "direct." This feedback resulted in Ms. O'Sullivan receiving lower performance ratings than she otherwise would have received.

42.     At the same time, RogersGray tolerated rude, harsh, and unprofessional communications by similarly situated, substantially younger males.

43.     For example, Jim Lopes, the CFO, would often raise his voice or yell at people, and would sometimes make people cry. Mr. Lopes's conduct caused many to avoid working with him. Mark Carrick, who was the Director of Business Process (a position at the same level as Ms. O'Sullivan, that also reported to the COO) could also be short tempered and dismissive.

44.     Neither Mr. Lopes nor Mr. Carrick were subjected to the same level of scrutiny as Ms. O'Sullivan for their communication styles.

### *Ms. O'Sullivan is Criticized for Opposing Violations of Law*

45.     Much of the feedback Ms. O'Sullivan received about being "abrupt" or "direct" related to her failure to be deferential to men at RogersGray who worked within the Sales function for Commercial Lines.

46.     For example, in 2016 Ms. O'Sullivan learned that RogersGray's commercial lines producers were instructing account managers to obtain confidential driving records and provide them to RogersGray's commercial clients (or "policyholders") without the knowledge or consent of the individual drivers in question. She further learned that at least one such policyholder had requested the information for purposes of making a hiring decision.

47.     This conduct violated the federal Driver's Privacy Protection Act, 18 U.S.C. § 2721 *et seq.* (the "DPPA"), which prohibits the disclosure of "personal information" about individuals from a state motor vehicle department for any purpose other than for the enumerated purposes listed in the statute, and by any means other than the means permitted by the statute.

48.     A knowing violation of the DPPA is a crime. 18 U.S.C. § 2723(a).

49.     It is also unlawful under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681b(b)(2)(A), to cause the procurement of a driving record (a form of consumer report) for

employment purposes without obtaining the driver's consent or clearly and conspicuously disclosing to the driver before the procurement that a consumer report may be obtained for employment purposes. Providing driving records for use in employment decisions without the knowledge or consent of the applicable drivers would constitute a willful violation of the FCRA.

50.    Ms. O'Sullivan reasonably believed the producers' conduct in obtaining and providing personal information about drivers to RogersGray's commercial policyholders without their consent was unlawful. Accordingly, she brought these concerns to the attention of Ms. Schaaf (who was then her direct supervisor), and Mike Robinson, who was the ultimate supervisor of the producers. Mike Robinson curtly responded to Ms. O'Sullivan, "You're wrong," or words to that effect.

51.    Rather than being deferential and dropping the matter, Ms. O'Sullivan continued to raise her concerns about privacy law violations to Mike Robinson, who eventually challenged Ms. O'Sullivan to "prove it."

52.    Ms. O'Sullivan did, resulting in RogersGray having to change its internal policies to prohibit producers from continuing to engage in this practice.

53.    Rather than wining praise, Ms. O'Sullivan's successful efforts to stop potentially unlawful conduct drew the ire of RogersGray's leadership. Indeed, Dave Robinson warned in her 2016 performance review (which was otherwise extremely positive) that Ms. O'Sullivan seemed "challenged by the producer role and how our culture has a strong focus to sales," and that her supposed "feeling" in this regard had "put off a number of producers."

### *Ms. O'Sullivan Opposes Violations of the Massachusetts Surplus Lines Statute*

54.     Another incident occurred in 2019 when Ms. O'Sullivan learned that producers were violating G.L. c. 175, § 168 (the "Massachusetts Surplus Lines Statute").

55.     A policy provided by a carrier that is not admitted in Massachusetts is known as a "surplus line." Because surplus lines are not backed the Massachusetts Insolvency Fund, Massachusetts law tightly regulates the selling of surplus lines. Among other things, the Massachusetts Surplus Lines Statute requires that licensed insurance brokers make a "diligent effort" to place policies with an <u>admitted</u> carrier prior to placing business with a non-admitted carrier. The statute further requires that brokers file an affidavit that they were unable to place the coverage in question with an admitted carrier, and that the policies be stamped with a disclosure statement.

56.     Ms. O'Sullivan learned that RogersGray was not following these requirements and that several dozen surplus lines had been improperly placed, totaling millions of dollars in premium.

57.      Upon learning this information Ms. O'Sullivan reasonably believed that RogersGray was violating laws including the Massachusetts Surplus Lines Statute.

58.     Ms. O'Sullivan spoke out against this practice at numerous meetings and was insistent that RogersGray needed to comply with Massachusetts law when placing surplus lines. Mike Robinson was in attendance on several such occasions. She further reported her concerns to the Director of Risk Placement, who indirectly reported to Mike Robinson, and to multiple Managers in Commercial Lines.

59.     Even after Ms. O'Sullivan voiced these concerns, to the best of her knowledge and awareness RogersGray did not change its behavior or practices with respect to surplus lines.

60.     In the wake of Ms. O'Sullivan's opposition to these violations of insurance laws, Mike Robinson became increasingly hostile towards Ms. O'Sullivan. Among other things, he ignored her or spoke rudely to her in business meetings, and on at least one occasion made a snide criticism of her facial expressions.

### *RogersGray Hires an Underqualified, Younger Professional to Replace Ms. O'Sullivan*

61.     Ms. O'Sullivan and Ms. Schaaf had both observed during 2018 and 2019 that Commercial Lines was understaffed, leading the existing staff to be overworked even as they delivered strong performance for the benefit of RogersGray. Ms. O'Sullivan advocated consistently for RogersGray to hire more staff members, but those requests were denied, and Ms. O'Sullivan lacked authority to hire staff herself.

62.     In January 2020, Ms. Schaaf announced that rather than hiring more staff, RogersGray would hire an Assistant Director who would report to Ms. O'Sullivan and help her manage the CL division.

63.     Ms. Schaaf announced in February that RogersGray had hired Valerie Tawa for this role. Ms. Tawa is approximately 15 years younger than Ms. O'Sullivan. She did not meet the qualifications for the Assistant Director role, as she lacked experience handling commercial accounts, and lacked a sufficient understanding of policy coverages and the insurance market. Due to her lack of experience and relevant knowledge Ms. Tawa was unprepared to manage the line staff in Commercial Lines.

64.     In hiring Ms. Tawa, RogersGray bypassed older female employees who were far more qualified than Ms. Tawa and deserving of consideration for promotion. This included Patricia Clendenen, who is approximately 54, and Connie Meine, who is approximately 67.

13

65.     In the Spring of 2020, Ms. Schaaf ordered Ms. O'Sullivan to put Ms. Tawa in charge of a major, complex project to achieve certain policy renewals. Ms. O'Sullivan repeatedly checked in with Ms. Tawa on her progress, but learned shortly before the renewal deadline that the renewals were nowhere near ready for completion. Ms. O'Sullivan called all hands to deck and worked double-time to complete the project by the renewal date, but in the chaos caused by Ms. Tawa's mismanagement, RogersGray lost hundreds of thousands of dollars in revenue.

66.     In June 2020, three weeks after Ms. O'Sullivan received the Excellence in Personal Leadership award, Dave Robinson informed Ms. O'Sullivan that Ms. Tawa had accused her of "bullying" her, and further indicated that Ms. Tawa had provided a "litany" of examples. Ms. O'Sullivan was shocked, and asked to be told the examples, but Dave Robinson refused to provide any.

67.     Ms. O'Sullivan voluntarily provided Ms. McEachern (the CPO, of head or HR) a file of her email communications with Ms. Tawa, and asked Ms. McEachern to let her know if any emails contained inappropriate communications. Ms. McEachern never reviewed the messages and never investigated the charge of "bullying."

68.     Ms. Tawa later provided Ms. O'Sullivan with the original complaint she had given to Dave Robinson. It turned out that the "examples" were completely unremarkable events, such as a time Ms. O'Sullivan forgot to respond to an email, didn't say good morning, or gave Ms. Tawa instructions about lunch or PTO policies.

### *RogersGray Suddenly Questions Ms. O'Sullivan's Leadership and Demotes Her*

69.     In July 2020, RogersGray fired Ms. Schaaf, who was then 53 years old. At this time, all directors within Operations other than Ms. O'Sullivan were assigned to report to Dave Robinson.

70.     Without explanation, Ms. O'Sullivan was assigned to report to Mr. Reilly, the Chief Sales Officer, who was part of Mike Robinson's side of RogersGray.

71.     On August 3, 2020, Mr. Reilly met with Ms. O'Sullivan and launched into an angry tirade. Referring to the CL division as a "mess," Mr. Reilly accused Ms. O'Sullivan of a "failure of leadership" of the division; accused her of not having done enough to advocate for her direct reports; and suggested Ms. O'Sullivan was to blame for three employees in her division being out on what he called "stress leave"—falsely implying Ms. O'Sullivan had somehow "stressed out" her own staff.

72.     Mr. Reilly then announced Ms. O'Sullivan was being removed from the position of CL Director, and that all of her former direct reports would now report to Ms. Tawa. Ms. O'Sullivan's new job was clearly a demotion, as it would have no direct reports and would entail "strategic operations" or "special projects."

73.     The reasons Mr. Reilly gave for Ms. O'Sullivan's demotion were false and pretextual. Thanks to Ms. O'Sullivan's leadership, Commercial Lines was in good shape financially, and Ms. O'Sullivan had received a company-wide award for her leadership just two months prior. Ms. O'Sullivan was well aware her division's staff had a heavy workload, but she had advocated unsuccessfully for over a year to add more staff to the division to address that issue, and did not have authority to make decisions on staffing on her own.

74. Mr. Reilly's claim about "stress leave" was particularly hurtful and false. Ms. O'Sullivan knew that each of the approximately three CL employees who were on leave at that time had highly personal, individualized reasons for doing so that had nothing to do with her leadership. Moreover, any issues caused by having staff on leave would have been mitigated if Ms. O'Sullivan's recommendations to increase her division's staffing had been accepted.

75. Ms. O'Sullivan refuted Mr. Reilly's false accusations and made clear to him that she believed the reasons given for her demotion were pretextual. Neither Mr. Reilly nor RogersGray took any action to investigate. Instead, Mr. Reilly told her Ms. O'Sullivan to "stop playing the victim." He further told her that Mike Robinson, Dave Robinson, and Ms. McEachern (the Chief People Officer), had instructed him to "document" every conversation he had with her.

76. The position that Ms. O'Sullivan was demoted to was newly created and lacked a job title. Reilly claimed that he did not "care" about job titles, and asked Ms. O'Sullivan to invent one. When Ms. O'Sullivan suggested "Chief Commercial Officer," however, Mr. Reilly angrily responded, "This is certainly NOT a promotion."

77. Mr. Reilly followed up again on August 6th, with an email making clear that Ms. O'Sullivan had been demoted as part of an effort to hold her "accountable" for the alleged "struggl[es]" of the Commercial Lines Division. He did not explain what "struggle[es]" the division was supposedly experiencing.

78. Mr. Reilly also darkly threatened that Ms. O'Sullivan would face consequences if she complained in any way about her demotion. Among other things, he informed her, "I very much want you on the team but for this to work you need to be 100% in as defined by your body language and energy around the new role." Mr. Reilly added that he had copied Ms. McEachern so that his threatening email would "become part of your personnel file."

79.     On August 12th, Ms. O'Sullivan met with Ms. McEachern to report that Mr. Reilly's comment on August 3rd, that Ms. O'Sullivan should "stop playing the victim," was inappropriate. Instead of registering her complaint, Ms. McEachern leaned across her desk and said, "I don't know what your problem is."

### *Ms. O'Sullivan Suffers Retaliation, Engages in Further Protected Activity, and is Fired*

80.     In the months following her demotion, Ms. O'Sullivan worked diligently to make her new assignment successful, and received praise for achieving "major progress" on projects that she worked on.

81.     Despite the commitment Ms. O'Sullivan showed, RogersGray began gaslighting her with false accusations about her attitude, and made further threats that she should not complain or display anything but enthusiasm about her demotion.

82.     For example, on October 20th, Mr. Reilly sent Ms. O'Sullivan a long, unexpected email on which he copied Ms. McEachern. In that email, Mr. Reilly stated that he had "enjoyed working" with Ms. O'Sullivan over the last few months, and praised her for the "continued positive dialogue and support you have demonstrated over the past couple of weeks." At the same time, he falsely accused her of showing "initial distance and lack of support," and threatened her that showing "resentment" would "not be acceptable moving forward." Mr. Reilly's email provided no specific examples and did not explain what he meant by "initial distance and lack of support" or "resentment."

83.     At the same time, Ms. O'Sullivan began to observe disturbing signs that her job was in jeopardy. In mid-October, she was provided with a draft of "objectives" for RogersGray in 2021 that did not list her name and included another person's name next to one of Ms. O'Sullivan's

projects. Mr. Reilly claimed that the omission must have been just a "mistake." Then, on November 10th, Ms. O'Sullivan asked Mr. Reilly a question about another project she was working on, for carrier incentives, and Mr. Reilly immediately suggested that responsibility should be "shifted" to someone else, even though it was one of the only key responsibilities still entrusted to Ms. O'Sullivan.

84.     On November 13th, Ms. O'Sullivan completed the self-review portion of her annual performance evaluation for 2020. Under the section for "Communication," Ms. O'Sullivan wrote:

> As a leader, I can be direct and forceful, innovative, and imaginative, analytical, and calculating. I try to balance quickness of thought and action by my desire to explore all the options. Mark Carrick and Jim Lopes have a similar communication style, but it does not appear to have hindered their success at the agency. I have been judged harshly for my communication style because I am direct; **I attribute this judgment to gender bias.**

(emphasis added).

85.     Ms. O'Sullivan further expressed her concerns that her demotion had been infected by discriminatory bias, in contravention of RogersGray's stated core values. She expressed this in her review as quoted below (the italicized language is quoted from RogersGray's core values, and Ms. O'Sullivan added underlines to that language to emphasize her concerns):

> Despite the professional challenges that I faced this year, and despite their negative impact on my personal wellbeing, I have performed my job every day. There appeared be recognition by senior leadership of the need to improve the foundations of service, however the rationale for actions taken to relieve me of senior management responsibilities in the Business Insurance Division were unclear. Although Jeff [Reilly] indicated in August that it was my "failed leadership" that led to the "mess" in Business Insurance, there is nothing in my personnel file to substantiate this claim. **The policy of the Agency is to make employment decisions based on legitimate business considerations, without regard to personal bias**. This policy is presumed to apply to all aspects of employment, including hiring, training, performance assessments, promotions, discipline, and termination. I have struggled greatly over the past few months trying to reconcile the agency's core value "*RogersGray is only as good as the people we employ. We strive to hire and develop talented professionals with strong character. We foster*

*an environment that is challenging, fun, respectful, supportive, and one which provides the right people with the opportunity to grow professionally with the way I have been treated. Consistency and accountability are keys to the way we do business. We conduct ourselves with <u>integrity</u> and are authentic and sincere. <u>We keep our promises</u> and honor our commitments to our clients and to each other. It is each employee's responsibility to both drive and embrace progress. We are accessible and <u>accountable</u> to our clients, <u>to each other</u>, and our communities. We foster a positive approach and attitude. When making decisions <u>we are thoughtful to take the right path</u>, not the easy path. RogersGray is committed to the future strength of our business, the advancement of our coworkers, and the evolving protection of our clients. We are committed to accomplishing these goals by <u>fostering an environment of empowerment, collaboration, innovation and professional growth</u>.["]*

(emphasis added to fourth sentence).

86.     Ms. O'Sullivan submitted the above comments in her self-review to RogersGray on November 14, 2020.

87.     Mr. Reilly never completed his portion of Ms. O'Sullivan's 2020 annual review.

88.     In the three weeks following Ms. O'Sullivan's comments in her 2020 annual review, RogersGray's attitude towards her worsened.

89.     For example, on November 24th, Ms. O'Sullivan had a one-on-one meeting with Dave Robinson in which she expressed that she was doing her best to add value to RogersGray and to carry out her new responsibilities. Mr. Robinson responded that he did not think she would ever "be able to accept the decision" that they had made about her role. He also stated that he thought Ms. O'Sullivan was "looking for the negative side" for a reason why she had been "pushed out"—implicitly admitting that Ms. O'Sullivan had been "pushed out" of her job.

90.     On December 3, 2020, less than three weeks after Ms. O'Sullivan submitted her written concerns about gender bias, RogersGray terminated her employment.

91.     The termination occurred in a meeting attended by Mr. Reilly and Ms. McEachern. Ms. McEachern informed Ms. O'Sullivan that RogersGray was firing her because "it's just not

19

working out." When Ms. O'Sullivan asked if there was a performance issue or if there was something Ms. O'Sullivan had not accomplished, Ms. McEachern reiterated, "No, it's just not working out." Neither Ms. McEachern nor Mr. Reilly expressed any concerns about Ms. O'Sullivan's commitment to or interest in her role.

92.    Later, Ms. McEachern authored an undated "memorandum to personnel file" about Ms. O'Sullivan that contained numerous inaccuracies and falsities, for example claiming that Ms. O'Sullivan had been moved to a new position in March 2020 rather than August 2020. It also falsely claimed that a reason for Ms. O'Sullivan's termination was that Ms. O'Sullivan had shown a "lack of interest in the new position."

93.    In the months following Ms. O'Sullivan's termination, Ms. Tawa was formally promoted to Ms. O'Sullivan's former position of Director of Commercial Lines. Ms. O'Sullivan's demoted position of "Strategic Initiatives" or "Special Projects" was later filled by Teresa Labrecque, who on information and belief is approximately 9 years younger than Ms. O'Sullivan.

94.    As a result of the actions described above, Ms. O'Sullivan has suffered significant economic harm and severe emotional distress.

## COUNT I
### Wrongful Termination in Violation of Public Policy

95.    Ms. O'Sullivan realleges and incorporates the above paragraphs as if fully set forth herein.

96.    Through her actions alleged above, Ms. O'Sullivan opposed conduct by Defendant which she reasonably believed to be violative of the DPPA and the Massachusetts Surplus Lines Statute.

97.     By and through the conduct set forth above, Defendant demoted and terminated Ms. O'Sullivan in retaliation for her opposition to its conduct that she believed to be violative of the DPPA and the Massachusetts Surplus Lines Statute.

98.     As a direct and proximate result thereof, Ms. O'Sullivan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, reputational harm and lost earning capacity, other financial losses, and emotional distress damages.

## COUNT II
### Sex Discrimination (Title VII)

99.     Ms. O'Sullivan realleges and incorporates the above paragraphs as if fully set forth herein.

100.    Through the conduct alleged above, RogersGray discriminated against Ms. O'Sullivan in the terms, conditions and privileges of her employment on the basis of her sex in violation of Title VII.

101.    As a direct and proximate result thereof, Ms. O'Sullivan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, other financial losses, and emotional distress damages.

## COUNT III
### Age Discrimination (ADEA)

102.    Ms. O'Sullivan realleges and incorporates the above paragraphs as if fully set forth herein.

103.    Through the conduct alleged above, RogersGray discriminated against Ms. O'Sullivan in the terms, conditions and privileges of her employment on the basis of her age in violation of the ADEA.

104.    RogersGray undertook these discriminatory actions willfully.

21

105.    As a direct and proximate result thereof, Ms. O'Sullivan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, other financial losses, and emotional distress damages.

## COUNT IV
### Retaliation (Title VII)

106.    Ms. O'Sullivan realleges and incorporates the above paragraphs as if fully set forth herein.

107.    Through the conduct alleged above, in violation of Title VII, RogersGray retaliated against Ms. O'Sullivan because of her opposition to conduct that she reasonably believed violated Title VII.

108.    As a direct and proximate result thereof, Ms. O'Sullivan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, other financial losses, and emotional distress damages.

## COUNT V
### Sex Discrimination (Mass. G.L. c. 151B)

109.    Ms. O'Sullivan realleges and incorporates the above paragraphs as if fully set forth herein.

110.    Through the conduct alleged above, RogersGray discriminated against Ms. O'Sullivan in the terms, conditions and privileges of her employment on the basis of her sex, in violation of M.G.L. c. 151B, § 4(1).

111.    As a direct and proximate result thereof, Ms. O'Sullivan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, other financial losses, and emotional distress damages.

## COUNT VI
### Age Discrimination (Mass. G.L. c. 151B)

112.    Ms. O'Sullivan realleges and incorporates the above paragraphs as if fully set forth herein.

113.    Through the conduct alleged above, RogersGray discriminated against Ms. O'Sullivan in the terms, conditions and privileges of her employment on the basis of her age in violation of M.G.L. c. 151B, § 4(1B).

114.    RogersGray undertook these discriminatory actions with knowledge or reason to know that they violated the Massachusetts Fair Employment Practices Act.

115.    As a direct and proximate result thereof, Ms. O'Sullivan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, other financial losses, and emotional distress damages.

## COUNT VII
### Retaliation (Mass. G.L. c. 151B)

116.    Ms. O'Sullivan realleges and incorporates the above paragraphs as if fully set forth herein.

117.    Through the conduct alleged above, RogersGray retaliated against Ms. O'Sullivan in violation of M.G.L. c. 151B, § 4(4).

118.    As a direct and proximate result thereof, Ms. O'Sullivan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, other financial losses, and emotional distress damages.

## Prayer for Relief

WHEREFORE, Ms. O'Sullivan respectfully requests that this Court:

1.    Enter judgment in her favor and against Defendants on all Counts;

2.  Award her compensatory damages, including, but not limited to, back pay, front pay, and lost benefits, all with interest at the statutory rate;

3.  Award her emotional distress damages, with interest at the statutory rate;

4.  Award her punitive and liquidated damages;

5.  Award Ms. O'Sullivan her attorney's fees and all other costs of litigation; and

6.  Order such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ms. O'Sullivan hereby demands a trial by jury on all Counts that are so triable.

Respectfully submitted,
**Teresa O'Sullivan**,
By her attorneys,

*/s/ Patrick J. Hannon*

Katherine J. Michon (BBO 561792)
Patrick J. Hannon (BBO #664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb Hannon LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
kmichon@hmrhlaw.com
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
P: (617) 723-8000
F: (617) 447-2800

Date: February 12, 2022