UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TERESA O'SULLIVAN, <br><br> PLAINTIFF, <br><br> v. <br><br> STRATEGUS RG, INC. F/K/A ROGERSGRAY, INC. AND BRP GROUP INC., <br><br> DEFENDANTS. | C.A. NO.  1:22-CV-10240-ADB <br><br> **LEAVE TO FILE MEMORANDUM IN EXCESS OF PAGE LIMIT GRANTED ON MAY 18, 2023** |

**DEFENDANTS STRATEGUS RG, INC. F/K/A ROGERSGRAY, INC.
AND BRP GROUP INC.'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

The central question presented by this case is:  How long must an employer wait for an employee to accept and embrace the changes in her role that the employer had every right to make? Two months?  Five months?  *Ten months*?  Plaintiff was notified of the change in her role on January 13, 2020.  By late November 2020, in meetings with the CEO, the head of HR and her direct manager, she was still expressing disappointment in the change and uncertainty about the Agency's reasons for the change.  After having spent those intervening *ten months* attempting to convince Plaintiff that the new role was extremely important to the organization, would allow her to focus on her well-regarded strengths, and would provide her with an opportunity to make a significant contribution to the organization, the leadership of RogersGray gave up.  Plaintiff was terminated on December 3, 2020, nearly eleven months after being first notified of her changed role.  In none of these ongoing and numerous conversations did Plaintiff ever suggest that she felt

she was being discriminated or retaliated against with respect to this change in her role, or in any aspect of her employment.

Now, Plaintiff claims that the change in her role and her subsequent termination were the result of age discrimination, gender discrimination, retaliation and/or in violation of public policy. For all of the reasons set forth below, there is not one scintilla of evidence to suggest that RogersGray's decisions regarding Plaintiff's employment were pretextual or motivated by discrimination, retaliation or any other illegal motive. Accordingly, summary judgment, in favor of Defendants on all of Plaintiff's claims, should be granted in full.

## FACTUAL SUMMARY

RogersGray (also referred to herein as the "Agency") is an insurance agency acquired by Charles Robinson in 1979. *See* Statement of Undisputed Material Facts in Support of Summary Judgment ("SUMF"), ¶ 3. Effective January 2015, Charles Robinson transitioned the business to his adult sons, Michael and David Robinson. *Id.* Michael (Mike) became Chairman and David (Dave) became President and CEO. *Id.* at ¶¶ 4-5. Together, the Robinson brothers owned 85% of the Agency.

Later in 2015, the Robinson brothers determined that the Agency's commercial insurance business needed new leadership due to the significant growth and increasing complexity of this part of the Agency's business. *Id.* at ¶ 15. After conducting an external search, Plaintiff Teresa O'Sullivan was identified as the leading candidate. *Id.* ¶¶ 17-22. After meeting with members of the leadership team of RogersGray, she was offered the position of Director of Commercial Insurance, a role that was geared toward servicing existing business accounts and managing the renewal process for those business insurance customers. *Id.* at ¶¶ 15, 23.

Plaintiff was 55 years old when RogersGray hired her and replaced a male predecessor.  *Id.* at ¶¶ 10, 19. Dave and Mike Robinson were excited about having someone with Plaintiff's extensive knowledge and experience take on what had been ongoing challenges in the commercial lines division. *Id.* at ¶¶ 21- 22. Importantly, at no time during her employment and even throughout this litigation, has anyone challenged Plaintiff's knowledge of the commercial insurance space. However, just being knowledgeable about a subject does not make one a good leader, or a good collaborator, or someone who can accept, understand and improve upon her shortcomings.  In this respect, Plaintiff's wealth of knowledge could not overcome her prickly personality and poor communication skills, which had material impacts on the operations and culture of this family-run business, particularly creating strife between the sales and service teams which, by necessity, needed to work collaboratively on behalf of the Agency's customers. *Id.* at ¶¶ 36, 42-60,72.

The Agency spent years working with Plaintiff to improve her communication style – including paying for a private executive coach in 2019. *Id.* at ¶¶ 36, 43, 45, 50-54, 60.  To her credit, Plaintiff acknowledged the feedback and tried to work toward improvement but, ultimately, she proved to be incapable of making significant, sustained changes. *Id.* at ¶¶ 46, 51-54. Specifically, Agency leadership repeatedly gave her feedback about the impact of her harsh and disrespectful demeanor (including her tendency to make disagreeable facial expressions during meetings), and the very negative feelings generated by her regular and open denigration of the sales personnel (referred to at the Agency as "producers") without whom Plaintiff's team would have no business to service. *Id.* at ¶¶ 36, 43, 45, 50-54, 60, 86, 88.  Meetings were held between Plaintiff and her counterpart on the sales side to try to get them to work better together. *Id.* at ¶¶ 28, 48, 64, 71-72.  In particular, Plaintiff's rigid style and open denigration of the sales executives had made working together very difficult. *Id.* at ¶¶ 36.  Plaintiff's immediate boss for most of her

employment, Chief Operations Officer Erin Schaaf, had also been concerned about Plaintiff's ability to prioritize, noting that she worked very long hours and still was not getting to all the items on her plate.  *Id.* at ¶¶ 60, 82.

As the commercial lines business continued to experience substantial growth, putting more pressure on Plaintiff's service side and requiring more collaboration and coordination between the sales and service teams, senior leadership at the Agency began considering organizational changes to address these increasing complex business issues.  *Id.* at ¶¶ 62, 80, 89, 91.  In particular, in a meeting held in early January 2020, Mike Robinson, Dave Robinson, Erin Schaaf and Jeff Reilly (then Chief Sales Officer) had an in-depth, hours-long meeting to brainstorm ideas for restructuring the Agency's commercial lines department.  *Id.* at ¶¶ 76-78.  As described by Schaaf, this was an extensive "whiteboarding session" where may different strategies were discussed.  *Id.* at ¶¶ 60, 82, 92

One major decision that came out of this meeting was to divide up Plaintiff's responsibilities.  *Id.* at ¶¶ 83, 92.  After several years where Plaintiff had been struggling to work collaboratively and communicate in an effective, productive manner with her colleagues, the senior leadership considered the lack of these skills to be an ongoing weakness of Plaintiff's.  *Id.* at ¶¶ 36, 43, 45, 50-54, 60, 84-85.  By stark contrast, Plaintiff's extensive and deep knowledge about business insurance and its many technical aspects was seen as her highest and best use.  *Id.* at ¶¶ 69, 74, 81.  Thus, the senior leadership determined that they would move Plaintiff into the role of Director of Strategic Initiatives.  *Id.* at ¶ 89.  This role would be designed to allow Plaintiff to focus on the many "big picture" or "foundational" issues of business insurance that would help the Agency navigate this significant and extremely complex portion of its business into the future. *Id.* at ¶¶ 80, 95.  In addition, the Agency decided to create an Assistant Director role which would

be responsible for the day-to-day management of the commercial service teams, managing the managers and being more directly involved in the management of frontline employees. *Id.* at ¶ 89. Plaintiff would retain the "Director" title and there would be no change in her compensation. Much of her daily people-management responsibilities (where her prickly personality and poor communication skills had resulted in difficult relationships) would be removed, thereby freeing her up to focus on those larger strategic issues and planning. *Id.* at ¶¶ 94-97.

Plaintiff's new role was relayed to her on January 13, 2020, first by her immediate manager, COO Schaaf. *Id.* at ¶ 105. Plaintiff did not react positively to Schaaf's communication about the change in her role. *Id.* at ¶ 109. Plaintiff immediately sought out Dave Robinson for clarity about the reasons for the change. *Id.* at ¶ 114-116. Dave Robinson reinforced to Plaintiff how the senior leadership believed this new role for Plaintiff would capitalize on her deep business knowledge and help the Agency plan for managing through the significant growth in the commercial insurance business. *Id.* Later that same day, Chief People Officer Allison McEachern, who had heard that Plaintiff did not immediately embrace this change in role, made it a point to stop by Plaintiff's office and reiterate the potential for this role and its importance to the Agency. *Id.* at ¶ 117. McEachern pointed to all the Post-its on Plaintiff's office walls, telling her that this new role would allow her to finally make progress on all the big ideas she had about improving the business insurance operations. *Id.* at ¶ 118.

Despite Plaintiff's hesitancy around this change, the Agency moved forward in implementing its plan while continuing its efforts to convince Plaintiff to embrace her new role. *Id.* at ¶ 126. To that end, it hired Valerie Tawa as the Assistant Director of Commercial Lines – someone who had been on Schaaf's radar from their years working together at an insurance carrier. *Id.* at ¶ 137. After serving for several years in the military, Tawa had been working in the insurance

business and, most particularly, had extensive experience managing people and teams. *Id.* at ¶¶ 132-133. As initially envisioned, Tawa would manage the frontline managers (the area of responsibility with which the Company perceived Plaintiff to struggle the most) and report directly to COO Schaaf. *Id.* at ¶ 138. When Plaintiff objected to this reporting line and asserted that Tawa should report directly to her, Dave Robinson and Schaaf capitulated to this request, hoping that this would help Plaintiff embrace and transition to her new role by allowing her to continue having some direct reports. *Id.* at ¶¶ 148-149. This turned out to be a terrible decision.

Tawa started at RogersGray in February and the senior leadership continued to have conversations with Plaintiff about her concerns regarding the new role. *Id.* at ¶ 137, 157. Wanting very much for Plaintiff to understand, accept and embrace the role, Dave Robinson, Schaaf and McEachern each had many, many conversations with Plaintiff trying to reassure her how important this role was to the organization. *Id.* at ¶¶ 105, 114, 117, 121, 130-131, 185, 186-187, 191, 234, 237, 239, 243-245. They continued to encourage Plaintiff to look at the job as an opportunity, as a way to leverage her years of experience and expertise to help the commercial lines business improve and expand. *Id.* Yet, Plaintiff continued to express doubt about taking on this role, continuing to look backwards and bemoan the decision to take her out of direct people management. *Id.* The Agency's leaders exercised extreme patience with Plaintiff because they genuinely believed in their strategy around this change and genuinely wanted to make it work with her. *Id.* They did not want to lose Plaintiff. Frankly, there is no other explanation for why they allowed Plaintiff to continually question the decision for the next ten months, rather than simply step into the new role and embrace it. *Id.*

With Plaintiff unhappy and reluctant to accept her new role, and with the Agency's decision to allow Tawa to report directly to Plaintiff, it is quite clear that Plaintiff set about to sabotage

Tawa simply out of spite. *Id.* at ¶¶ 159-167. Because Tawa's prior experience had been on the "carrier side" of the insurance business, as opposed to the "agency side", there was a certain learning curve that Tawa required. *Id.* at ¶ 158. However, rather than assist Tawa and help her integrate smoothly into the organization, Plaintiff took a passive aggressive approach – piling on tasks after tasks with little to no explanation or assistance; sending her jargon-filled emails that seemed designed to confuse and highlight Tawa's lack of agency experience. *Id.* at ¶¶ 159-167. As Tawa sought out Plaintiff for guidance on questions she had, instead of sitting down with Tawa and helping guide her with a personal touch, Plaintiff responded with lengthy emails full of the jargon to which Tawa had not fully acclimated. *Id.* at ¶¶ 162, 175. When Tawa expressed some concerns to Schaaf about the lack of support and guidance she was receiving from Plaintiff, Schaaf attempted to coach Plaintiff and encourage her to engage with Plaintiff face-to-face, rather than sending her these detailed, dense emails. *Id.* at ¶¶ 177-179.

One day in June, Chief Sales Officer Jeff Reilly stopped by Tawa's office to check in and see how Tawa was adjusting to RogersGray. *Id.* at ¶¶ 195-196. The military-trained Tawa broke down, explaining how Plaintiff's treatment of her had brought her to the brink of quitting. *Id.* at ¶¶ 197-199. Reilly immediately spoke to Dave Robinson who promptly scheduled a meeting with Tawa. *Id.* at ¶ 200. In preparation for her meeting with Dave Robinson, Tawa drafted a summary of the events that had transpired since joining RogersGray which had brought her to the brink of quitting. *Id.* at ¶ 201. This document, entitled "My Truths", listed the myriad ways that Plaintiff had made Tawa feel bullied, set up for failure, isolated and self-doubting. *Id.* When Tawa met with Dave Robinson, she shared her experiences and interactions with Plaintiff. *Id.* He was extremely concerned about what he heard, including that she felt bullied by Plaintiff and that she perceived Plaintiff's treatment of her as "malicious". *Id.* at ¶¶ 202-204. Dave Robinson then asked

Schaaf and McEachern to join him at his next one-on-one meeting with Plaintiff, so that he could discuss with Plaintiff the information Tawa had shared with him. *Id.* at ¶¶ 205-207.

In this meeting, Dave Robinson shared with Plaintiff the feedback that Tawa had given him, including her feelings of being bullied and otherwise mistreated. *Id.* at ¶ 207. As reported by Robinson, Schaaf and McEachern, Plaintiff acted surprised but offered no substantive defense or explanation of her behavior or context for Tawa's perceptions. *Id.* at ¶¶ 208-211. A few days later, however, Plaintiff sent McEachern *300 pages* of emails between her and Tawa, asking McEachern to review them and provide her with feedback on whether she had done anything wrong. *Id.* at ¶ 212. This was how someone who purported to be a leader at RogersGray responded to complaints about her leadership and guidance. *Id.* at ¶ 213. Just like her willful denial about the change in her role, Plaintiff refused to accept that, just six months into her new job, Tawa felt badly enough about how Plaintiff was treating her to come forward with her complaints and consider quitting. *Id.* at ¶ 214.

Or, this is exactly what Plaintiff wanted. From the outset, Plaintiff was unhappy with the Agency's restructuring decisions that led to Tawa's hiring. *Id.* at ¶ 112. As Tawa testified, rather than helping Tawa get acclimated to her new role at RogersGray, Plaintiff repeatedly told Tawa she didn't know why Tawa was there or what her role was supposed to be. *Id.* at ¶ 161. Lest Plaintiff's animosity toward Tawa be characterized as mere speculation, Plaintiff's own words, in text messages she sent to Tawa's *direct subordinate*, both during her employment and on the day of her termination, provide concrete proof that Plaintiff had nothing but disdain for Tawa – the person that *she requested* report directly to her:

- 8/23/20: Maybe she has diarrhea from her liquid diet. I should tell her no matter how much weight she loses she'll still be a hideous beast.
- 9/15/20: Oh my god what is wrong with that woman every time I go to the bathroom to P I have to run out with my nose blocked. She's a human sized

> waste disposal Plant. Could she be shitting herself so badly already that
> we're gonna lose her to ass blow out disability?
>
> • 12/3/20: What did the fat red c*nt say

*Id.* at ¶ 223.

It is hardly surprising that the person Plaintiff felt free to call a "c*nt", mock her bathroom habits

and disparage her physical appearance felt bullied and set up for failure by Plaintiff. *Id.* at ¶¶ 218-

228. It is clear that is exactly what was happening. In response to Tawa's complaints, Tawa was

directed to start reporting to Schaaf. *Id.* at ¶ 215.

In early July, COO Schaaf was let go. *Id.* at ¶ 229. Jeff Reilly, the Chief Sales Officer was

given the additional role of Chief Operations Officer for commercial lines, taking on some of

Schaaf's responsibilities. *Id.* at ¶ 230. With this change, Plaintiff began reporting directly to

Reilly. *Id.* at ¶ 231. By this point in time it was late July/early August 2020 and Plaintiff's changed

role had still not been formally announced as she had not yet committed to the role. *Id.* at ¶ 233.

She was continuing to claim that she still had "questions" about the reasoning behind the decision

and concerns that this position was a "demotion." *Id.* at ¶ 234. The Agency's response to

Plaintiff's continued refusal to just accept the role and move on after seven months is telling. *Id.*

Rather than throw up their hands after going in circles with Plaintiff on this subject, Dave

Robinson, McEachern, Schaaf and, later, Reilly, *still* believed they could convince Plaintiff that

this role was built for her and her success in this role was very important to the Agency. *Id.* at

¶ 235. Specifically, upon assuming the role of COO for commercial lines, Reilly expressed his

confidence to Dave Robinson and McEachern that he would be able to bring this situation to a

conclusion by convincing Plaintiff that this role was important, that it presented an opportunity

both for her and the Agency, and that he would get her to fully embrace and perform in the Strategic

Initiatives Director role. *Id.* at ¶¶ 235-238. They all knew that the "will she or won't she" dynamic

had been allowed to linger for far too long and Reilly believed he could be the one to get her where the Agency needed her to be. *Id*. at ¶¶ 235-236.To this end, Reilly began meeting with Plaintiff on this specific topic. On August 3 they met and Reilly basically told her that she was going into the Strategic Initiatives role and he reiterated why leadership believed this was an important role for the Agency that honed in on her strengths. *Id.* at ¶¶ 236, 239-240. Reilly gave her a job description and invited her to amend it "as needed," highlighting that this was a role over which she had ownership and the Agency was open to her ideas for how to maximize her impact in the role. *Id.* at ¶¶ 241-245. In an email dated August 6, 2020, Reilly reiterated the need for her to demonstrate "100% commitment" to the role notwithstanding her "disappointment in no longer being the Director of CL," reinforcing the sentiment that her "skill set is a great match for the role and when executed will bring a huge lift to the entire CL department." *Id.* at ¶ 246.

Dave Robinson also continued to engage Plaintiff on this topic. *Id.* at ¶¶ 248-249. However, in an email dated August 13, Plaintiff told Robinson that she still hadn't "come to a place of peace with the decisions..." *Id.* at ¶ 250. Yet the leadership *still* didn't give up on her. McEachern had a conversation with Plaintiff on September 11 where McEachern described Plaintiff as "really struggling" with accepting the role. *Id.* at ¶ 258. While McEachern expressed the view after this meeting that it was "[t]ime to close the loop here and nail this down with her and move forward. I have answered some of these questions already, multiple times with her." *Id.* Yet, eight months in, the leadership *still* didn't give up on her.

In October, Reilly was still trying to assuage Plaintiff's expressed concerns about the new role, telling her "While I understand this was a big change for you we have both agreed we need to move past this and not continue to have our history hold us back or foster resentment over the change." *Id.* at ¶ 265. In this time period, the Agency was also attempting to get Plaintiff to sign

her new job description, which was required for employees taking on new roles. *Id.* at ¶¶ 261-263. Plaintiff was explicitly avoiding these requests, which was viewed as another sign that Plaintiff was not moving forward. *Id.* at ¶¶ 266-267.

Despite their best efforts, however, the circular pattern of acceptance followed by doubt continued: a conversation with Plaintiff appeared to get her to accept the role and the opportunities it presented for her. *Id.* at ¶ 253. Then, a few days later, she would start expressing dismay at being taken out of the prior role, uncertainty about what the new role entailed and her concern that this was a demotion. They were back at square one. *Id.* Again. This same pattern repeated itself in conversations with Dave Robinson, Reilly and McEachern. *Id.* at ¶ 254.

The three of them began to realize that this version of "Groundhog's Day" had been going on for way too long and needed to come to an end. *Id.* As they shared their individual conversations with Plaintiff, and the circular nature of those conversations (e.g., she seems on board, finally; oops, she's back to asking the same questions, again), they came to realize that the situation was futile. *Id.* Dave Robinson had a conversation with Plaintiff on November 24 during which Plaintiff continued to question the Agency's reasons for changing her role and to express her unhappiness about the change, specifically, her "hurt and pain" about the change in her role. *Id.* at ¶¶ 268-270. Although, importantly, at no point in any of these conversations had she suggested that the change or the Agency's reasons for it were discriminatory in any way. As Plaintiff's own notes reflect, Dave Robinson expressed his exasperation with these continuing conversations, asserting that he did not believe she was ever going to get past it. *Id.* at ¶¶ 272-274.

This November 24 conversation was followed by another one with Reilly on November 30 in which Plaintiff's notes reflect that she told Reilly, incorrectly, that "no one has had the decency to tell me why the job I loved and why the job I did very well was taken away from me." *Id.* at

¶¶ 276, 278.  In this meeting Reilly again asserted that she "can't continue to live in the past." *Id.* at ¶¶ 277.  It was at this point in time, that Reilly, Robinson and McEachern finally concluded that Plaintiff was never going to accept the new role and move forward.  *Id.* at ¶¶ 280-281.  In a conversation among the three of them on November 30, they reached this consensus and, finally, gave up.  *Id.* at ¶¶ 282-283.  Plaintiff was notified of her termination on December 3, 2020.  *Id.* at ¶¶ 284.  She was offered a separation package that included severance and outplacement services, which she declined.  *Id.*  Plaintiff filed her complaint of discrimination with the MCAD and this litigation ensued.

Plaintiff claims in this action that the decision to take her out of a direct people-manager role and, ultimately, terminate her for failing to embrace the new role, was because of gender and/or age discrimination, was retaliatory, and violated public policy.  However, it utterly defies logic that, if the Company really had animus towards her for discriminatory or retaliatory reasons, it would spend more than *10 months* talking to her and trying to convince her, over and over and over again, about how the new role allowed her to focus on her strengths and reduce areas of conflict around her admitted deficits in communication and interpersonal style.  Whether it was a wise business decision to allow Plaintiff to ruminate on this change in roles for so long is certainly a valid question; however, trying to give her time and space to embrace the role demonstrates the exact opposite of animus and puts the lie to her claims in this action.

## LEGAL ARGUMENT

Summary judgment is appropriate where, as here, the pleadings, "depositions... affidavits... interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56. As discussed below, summary judgment is appropriate on all of Plaintiff's claims because Plaintiff cannot point

to any evidence in this record to support her assertions that Defendants discriminated against her, retaliated against her for engaging in protected activity, or terminated her in violation of public policy. *See Pina v. Children's Place*, 740 F.3d 785, 795-96 (1st Cir. 2014) ("If a nonmovant bears the ultimate burden of proof on a given issue, she must present definite, competent evidence sufficient to establish the elements of her claim in order to survive a motion for summary judgment....This is no less true in discrimination and retaliation cases where motive is at issue." (internal punctuation and citations omitted)); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842-43 (1st Cir. 1993); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## I.    PLAINTIFF HAS ADDUCED NO RECORD EVIDENCE TO REMOTELY SUGGEST THAT HER ROLE WAS CHANGED OR SHE WAS TERMINATED FOR REASONS RELATED TO HER AGE OR GENDER.

Plaintiff alleges that Defendants violated Mass. Gen. Laws ch. 151B, Title VII and the ADEA by changing her role and subsequently terminating her for discriminatory reasons related to her age and gender.  As to all Plaintiff's discrimination claims, because Plaintiff lacks direct evidence of age or gender discrimination, she must prove her case according to the familiar three-stage paradigm outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973). *See Prescott v. Higgins*, 538 F.3d 32, 40 (1st Cir. 2008) ("The familiar *McDonnell Douglas* framework governs Title VII . . . and Massachusetts General Laws, chapter 151B claims."); *Tombeno v. Fed. Ex. Corporate Servs.*, 284 F.Supp.3d 80, 86 (D. Mass. 2018) (*McDonnell Douglas* burden-shifting framework is used to analyze claims under ADEA.)  The first step in the *McDonnell Douglas* framework requires Plaintiff to establish a *prima facie* case. *See, e.g., Knight v. Avon Prods., Inc.*, 438 Mass. 413, 422-23 (2003).

If that burden is met, Defendants must articulate a legitimate non-discriminatory, non-retaliatory reason for their decision. *Hidalgo v. Overseas Condado Ins. Agencies, Inc.*, 120 F.3d

328, 334 (1st Cir. 1997).  For Chapter 151B claims, Defendants must also produce credible evidence to show that the reason advanced was the real reason.  *See, e.g., Blare v. Huskey Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 441-42 (1995).  Once Defendants do so, Plaintiff must be able to persuade the fact finder, by a preponderance of evidence, that the articulated justification is not the real reason, but a pretext for discrimination and/or retaliation.  *See, e.g., Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 154 (1st Cir. 2009).  The burden of proving unlawful discrimination/retaliation rests at all times with Plaintiff.  *See, e.g., Ray v. Ropes & Gray LLP*, 799 F.3d 99, 113 (1st Cir. 2015); *Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 118 (2000).

**A.  Plaintiff Cannot Establish A *Prima Facie* Case of Discrimination Based On Her Change in Role.**

To establish a *prima facie* case of discrimination under Title VII, ADEA, or Chapter 151B, based on the change in her role from Director of Commercial Lines to Director of Strategic Initiatives, Plaintiff must show, *inter alia*, that the change in her role was an adverse action. *Rodríguez-Cardi v. MMM Holdings, Inc*., 936 F.3d 40, 47 (1st Cir. 2019); *Woodward v. Emulex Corp*., 714 F.3d 632, 638 (1st Cir. 2013) (citing *Knight v. Avon Prods., Inc.*, 438 Mass. 413 (2003)). *See also McDonnell Douglas Corp.*, 411 U.S. at 800-06.  Plaintiff cannot do so, because it is undisputed that a reasonable person in her position would view the role change as a clear advantage and opportunity, not an adverse action.

An adverse action typically involves "discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) (*quoting Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). For an employment action to be adverse, it "must materially change the conditions of plaintiffs' employ,"

id., which means that it must "be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002). "[R]eassignment with significantly different responsibilities may be actionable." *Burns v. Johnson*, 829 F.3d 1, 10 (1st Cir. 2016) (internal quotation marks omitted), however, whether reassignment is an adverse action often "depends on a constellation of surrounding circumstances." *Burlington N. v. White*, 548 U.S. 53, 69 (2006). Moreover, the applicable legal standard requires consideration of whether reassignment is materially adverse for a reasonable person in Plaintiff's particular circumstances. *See Id.* at 68-69; *Yee v. Mass. State Police*, 481 Mass. 290, 297 (2019) ("The disadvantage must be objectively apparent to a reasonable person in the employee's position; 'subjective feelings of disappointment and disillusionment' will not suffice."); *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 663, 672 N.E.2d 1 (1996). Courts examine whether an employee has suffered an "adverse employment action" on a case-by-case basis. *King v. City of Boston*, 71 Mass. App. Ct. 460, 470, 883 N.E.2d 316 (2008), *quoting Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996).

Here, it is undisputed that when Plaintiff's role changed from Director of Commercial Lines to Director of Strategic Initiatives, her salary, benefits and title level did not change. She continued to report to the COO. SUMF ¶ 94. It is also undisputed that in the Director of Strategic Initiatives role, Plaintiff would no longer have to be responsible for directly managing employees, with which she continually struggled for years, would not have to deal with ongoing conflict between commercial lines and sales, for which she had been previously criticized, and could use her new role to focus on Agency-wide projects that she complained she never had time to accomplish. *Id.* at ¶¶ 36, 43, 45, 50-54, 60, 84-85. Based on these facts, a reasonable person in Plaintiff's position would have welcomed the change, which utilized Plaintiff's extensive

knowledge and experience in the insurance industry while removing the responsibilities that brought her critical performance reviews and complaints from her co-workers. Moreover, Plaintiff has no evidence, other than her own subjective feelings regarding the job change, that the change was adverse. Because Plaintiff cannot show that her role change was an adverse action, she cannot prove a *prima facie* case of discrimination based on her role change, and those claims should be dismissed.

### B. Concerns About Plaintiff's Ongoing Communication Issues Were A Legitimate, Nondiscriminatory Reason For Changing Her Role, As Was Her Termination For Refusing To Accept That Changed Role.

Even if Plaintiff could prove that her role change was an adverse action, Defendants have established a legitimate, nondiscriminatory reason for changing Plaintiff's role, and subsequently terminating her. The undisputed record evidence demonstrates that Plaintiff had ongoing issues with her communication style that created conflict with her peers throughout her employment. *Id.* at ¶¶ 36, 43, 45, 50-54, 60, 84-85. These issues were identified in her very first annual evaluation and in every evaluation thereafter. *Id.* They were addressed in meetings with Schaaf who spent time navigating the conflicts generated by Plaintiff's behavior. *Id.* RogersGray went so far as to hire an executive coach to assist Plaintiff with these problematic behaviors. *Id.* at ¶ 130. Despite all of these efforts, the Agency's leadership remained dissatisfied with Plaintiff's behavior and the conflicts she created. *Id.* at ¶¶ 79-80.

It is also undisputed that in early 2020, the senior leadership team was looking to restructure the Commercial Lines business to address the significant growth and complexity of this part of its business. *Id.* at ¶¶ 91-92. As a result of that evaluation, the decision was made to move Plaintiff into a new role that would allow her to focus on strategic initiatives, so as to help manage the growth and future of the commercial lines business. *Id.* at ¶¶ 93-95. It is undisputed that the leadership viewed this role as important to the organization and Plaintiff to be uniquely suited to

take on this important role.  *Id.* at ¶ 99.  It is also undisputed that part of the planning for this restructure and her new role was to reduce Plaintiff's responsibilities for people management.  *Id.* at ¶ 89.  In this regard, a new position was created, Assistant Director, that would be responsible for the day-to-day management of the commercial service lines teams.  *Id.*

As to Plaintiff's termination, it is also undisputed that the decision to move Plaintiff into the new role was made, and communicated, in January 2020.  *Id.* at ¶¶ 90, 105.  When Plaintiff was not happy with the change in her role, leadership tried to "slow roll" the change so as to allow time for Plaintiff to accept and embrace the role.  *Id.* at ¶¶ 112, 129.  They allowed the new Assistant Director to report to Plaintiff, even though that was not the original plan, as a way to mollify Plaintiff.  *Id.* at ¶ 149.  As winter moved into spring and then summer, Plaintiff had still not demonstrated her acceptance of the role.  *Id.* at ¶¶ 180-191.  In the fall, Plaintiff had more conversations with Dave Robinson, Reilly and McEachern, all of which led these leaders to conclude that Plaintiff was not able to move past her unhappiness about the change in her role and embrace the new role.  *Id.* at ¶¶ 248, 249.  After an unsuccessful ten months of patiently trying to move Plaintiff past the decision to change her role, the leaders at RogersGray concluded that Plaintiff was either unable or unwilling to move forward and, as a result, they terminated her employment.  *Id.* at ¶¶ 282, 283.

With regard to both decisions challenged in this action, Defendants have more than met their burden of production as to the truthfulness and legitimate, non-discriminatory reasons for its actions.  *See, e.g., Dusel v. Factory Mut. Ins. Co.*, No. CV 19-11698-NMG, 2021 WL 2953322, at *6 (D. Mass. July 14, 2021), *aff'd*, 52 F.4th 495 (1st Cir. 2022) (communication and management issues were legitimate, non-discriminatory reasons for termination); *Cornwell v. Dairy Farmers of Am., Inc.*, 369 F. Supp. 2d 87, 105 (D. Mass. 2005) (unprofessional and inappropriate behavior

toward co-workers was legitimate, non-discriminatory reason for termination); *Benoit v. Technical Mfg. Corp.*, 3d 166, 174 (1st Cir. 2013) (3d 166, 174 (1st Cir. 2013) (showing of employee's unwillingness to work cooperatively with supervisor, among other issues, met employer's burden); *Parra v. Four Seasons Hotel*, 605 F. Supp. 2d 314, 328 (D. Mass. 2009) (documented conflict with management including interpersonal difficulties was non-discriminatory reason).

### C. Plaintiff Cannot Defeat Summary Judgment On Her Age And/Or Gender Discrimination Claims As There Is No Record Evidence Of Bias Or Pretext.

In order to avoid summary judgment, Plaintiff must identify genuine issues of material fact demonstrating that the reasons offered by RogersGray are a pretext for intentional discrimination. *See, e.g., Ray*, 799 F.3d at 113. [1] At this stage, Plaintiff "must produce sufficient evidence to create a genuine issue of fact as to two points: (1) the employer's articulated reasons for its adverse actions were pretextual, and (2) the real reason for the employer's actions was discriminatory animus." *Id.*; *see also Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 821-22 (1997) (holding plaintiff may only prevail by "showing that the reason given by the employer is merely a pretext for discrimination").

Here, there is absolutely nothing in the record to suggest that RogersGray's reasons for changing Plaintiff's role or ultimately terminating her are pretexts for intentional discrimination based on her age or gender. In the first instance, Plaintiff replaced a male predecessor, was 55 years old when she was hired, and testified that no one ever made any statements to her that were derogatory of her age or gender. [2] *Id.* at ¶¶ 15, 19, 307, 310.  Second, it is undisputed that Plaintiff's

---

[1] Courts apply the same burden-shifting framework from *McDonnell Douglas* for Title VII and Chapter 151B claims. *See, e.g., Russell v. Cooley Dickinson Hosp.*, 437 Mass. 443, 452 n.6 (Mass. 2002).  To show pretext under the ADEA, a plaintiff must produce sufficient evidence "to show both that the employer's proffered reason is a sham and that discriminatory animus sparked [its] actions." *Coogan v. FMR, LLC*, 264 F. Supp. 3d 296, 306 (D. Mass. 2017), *citing Cruz–Ramos v. P.R. Oil Co.*, 202 F.3d 381, 384 (1st Cir. 2000).

[2] Plaintiff claims that two male employees also had issues with their communication style but received no negative repercussions as a result. Neither one ever made racist and offensive comments toward subordinate employees, as Plaintiff admitted she did. In 2018 and 2019, human resources verbally counseled one gentleman about

interactions and communications with others at the Agency were memorialized in each of her annual reviews[3] and had created sufficient strife that RogersGray hired an executive coach to work with Plaintiff on these issues. *Id.* at ¶¶ 36, 43, 45, 50-54, 60.Third, as Plaintiff testified, RogersGray had every right to change her role.  *Id.* at ¶ 127.  Fourth, when they restructured the commercial lines organization, they decidedly *did not* take the opportunity to terminate her at that point; choosing instead to try to capitalize on her strengths and minimize the conflict created by her weaknesses by putting her in an important role that had the potential to create tremendous value to the commercial lines business.  Finally, RogersGray exercised nearly unimaginable patience in the hopes that Plaintiff would eventually embrace her new role and use her technical knowledge and skills to the great benefit of RogersGray. *Id.* at ¶ 253. Instead, by the end of November, when Plaintiff was still ruminating about the reasons for the change in her role and expressing how much she liked her prior role, the Agency finally realized that all the patience in the world was not going to get Plaintiff to accept her new role.  They gave up trying and she was terminated.  *See Coogan v. FMR, LLC*, 264 F. Supp. 3d 296, 306 (D. Mass. 2017), *citing Miner v. Connleaf*, 989 F.Supp. 49, 53 (D. Mass. 1997) ("the plaintiff cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer").  Further, Dave Robinson, who participated in the decision to terminate Plaintiff, was key in the decision to hire Plaintiff when she was 55.  SUMF ¶ 24.  "[I]t is improbable that the same persons who hire or promote someone already in an older age bracket will suddenly develop an aversion to older people."  *Dziamba v. Warner & Stackpole LLP*, 56 Mass. App. Ct. 397, 406 (2002).  It is

---

communication that could be construed by employees as frustrated and angry, and in 2020, the other gentleman received comments in a performance review regarding showing frustration in his communications.  SUMF ¶ 333.

[3] The Agency's culture and commitment to positive work relationships is demonstrated by the fact that it regularly addressed the interactions and behaviors of its leaders, as reflected in the annual evaluations of Jim Lopes and Mark Carrick.

also well settled that a decision maker is unlikely to discriminate against someone in the same protected class. Schaaf, a 53-year old female, played a key role in the decision to change Plaintiff's role. SUMF ¶ 14. McEachern, a female, was a key decisionmaker in the decision to subsequently terminate Plaintiff. *Id*. at ¶ 283. Reilly was 52 years old and McEachern was 46 years old in 2020, each only a few years younger than Plaintiff. *See Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1471 (11th Cir. 1991) (managers over 40 are "more likely to be the victims of age discrimination than its perpetrators"); *LeBlanc*, 6 F.3d at 847 (finding that plaintiff failed to establish claim of age discrimination and noting that decision maker "was nearly sixty years old when he decided to terminate" plaintiff).

There is not one scintilla of evidence to remotely suggest that Plaintiff's age or gender played any role whatsoever in this course of events or that RogersGray's explanations for its actions are in any respect pretextual. Instead, the evidence is overwhelming that RogersGray acted entirely for legitimate business reasons and went to extraordinary lengths to give Plaintiff the time and space to embrace her new role – which Plaintiff never did.

## II. SUMMARY JUDGMENT FOR DEFENDANTS IS WARRANTED ON PLAINTIFF'S RETALIATION CLAIMS UNDER TITLE VII AND THE MGL

In Counts IV and VII of her Complaint, Plaintiff alleges retaliation claims under Title VII and Chapter 151B. As set forth below, there is no evidence to support even a *prima facie* case, much less evidence to create a disputed fact as to pretext, such that Defendants are entitled to summary judgment on these claims as well.

To make out a *prima facie* case of retaliation under the discrimination statutes, Plaintiff must establish that (1) she engaged in protected activity, (2) she suffered some adverse action, and (3) a causal connection existed between the protected conduct and the adverse action. *Bennett v. Saint-Golbain Corp.*, 507 F.3d 23, 32 (1st Cir. 2007) (ADEA); *Mole v. Univ. of Mass*., 442 Mass.

582, 591-92 (2004) (Chapter 151B).

While Plaintiff arguably engaged in protected activity by referencing gender bias in her 2020 self-evaluation, Plaintiff cannot prove that there is any causal connection between that statement and her termination.[4] In particular, the undisputed record evidence establishes that, prior to her termination, no one at RogersGray, including, in particular, the individuals who made the decision to terminate her employment, was ever made aware that Plaintiff arguably engaged in protected activity.   SUMF ¶¶ 288-305.   While there may be a dispute of fact as to whether Plaintiff's self-evaluation was even submitted in the first instance, there is absolutely no evidence to dispute that the three individuals who were involved in Plaintiff's termination decision – Dave Robinson, Jeff Reilly and Allison McEachern – had no knowledge of the statement made in Plaintiff's self-evaluation until they were advised of the allegation in Plaintiff's MCAD complaint filed more than six months after her termination.  *See, e.g., Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 n.11 (1st Cir. 2014) ("The retaliating party must be aware of the protected activity that he is believed to be retaliating against."); *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 85 (1st Cir. 2006) ("[T]here must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action.").  In the absence of any evidence that Dave Robinson, Reilly, or McEachern were aware of Plaintiff's reference to gender bias in her 2020 self-evaluation, Plaintiff cannot establish a *prima facie* case of retaliation.

Even if there were evidence to support a *prima facie* case of retaliation, Plaintiff must also establish that RogersGray's reason for terminating her was a pretext to mask retaliatory animus. *See Mole*, 442 Mass. at 591; *Roman v. Potter*, 604 F.3d 34, 39 (1st Cir. 2010).  As detailed above, there is no evidence of pretext relating to the reason for Plaintiff's termination.  As late as

---

[4] Plaintiff does not allege that she engaged in any arguably protected activity prior to this 2020 self-evaluation. Accordingly, other than her termination, there is no adverse action upon which her retaliation claim can be based.

November 30, 2020, Plaintiff was still expressing her displeasure at the decision to change her role that had been communicated to her in January.  SUMF ¶ 276.  The overwhelming evidence is that RogersGray waited patiently for months and months – ten months, to be precise – in the hopes they could convince Plaintiff of how important the new role was and how she could make important contributions to the organization in that role.  When they finally realized that they were never going to convince Plaintiff to embrace the role, they gave up and terminated her.  There is no evidence of pretext in this decision and, thus, summary judgment for Defendants on Plaintiff's retaliation claims should be granted as well.  *See Poon v. Mass. Inst. Tech.,* 74 Mass. App. Ct. 185, at 201 (affirming dismissal of retaliation claim absent evidence of pretext to mask retaliatory animus).

## III.   THERE IS NO LEGAL OR FACTUAL BASIS FOR PLAINTIFF'S WRONGFUL TERMINATION CLAIM

Plaintiff's claim for wrongful termination in violation of public policy rests on her allegations that, several years prior to her termination, she raised concerns about RogersGray's practices under the Driver Privacy Protection Act ("DPPA") and later raised concerns about RogersGray's practices related to surplus lines. SUMF ¶¶ 311-313.  Plaintiff's claim for wrongful termination in violation of public policy fails because (1) her allegations are too vague and ill-defined to trigger the narrow public policy exception to the at-will employment rule, and (2) Plaintiff conceded in her deposition that she has no reason to believe raising these concerns led to her termination.

There is no dispute that Plaintiff was an at-will employee at RogersGray.  The general rule in Massachusetts is that an at-will employee can be discharged at any time for any reason or for no reason at all. *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 89 (1st Cir. 2016). Massachusetts law recognizes an exception to this rule to "protect[ ] at-will employees from terminations that

conflict with sufficiently important and clearly defined public policies." *Id*. Courts interpret this public policy exception narrowly to avoid altering the baseline rule of at-will employment. *Barbuto v. Advantage Sales & Mktg.*, LLC, 477 Mass. 456, 78 N.E.3d 37, 50 (2017). Plaintiff bears the burden to establish a "sufficiently important and clearly defined public policy" warranting her protection from termination. *Murray*, 821 F.3d at 90. "Whether there is a sufficiently defined public policy is a matter of law for the court to determine." *Simas v. First Citizens' Fed. Credit Union*, 63 F.Supp.2d 110, 114 (D. Mass. 1999).

Under this limited public policy exception, "[r]edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith-Pfeffer v. Superintendent of Walter Fernald State Sch.*, 404 Mass. 145, 149-50 (1989) (*citing Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 668 n. 6 (1981)). In addition, an employee may not be terminated for assisting in an ongoing governmental investigation into illegal conduct of his employer, *Flesner v. Tech. Commc'ns Corp.*, 410 Mass. 805, 810-811 (1991), or making a good faith complaint within the company about perceived violations by the company or its employees of the criminal law. *Shea v. Emmanuel Coll.*, 425 Mass. 761, 762–763 (1997). "The distinction of importance is between a discharge for an employee's internal complaint about company policies or the violation of company rules, for which liability may not be imposed, and an internal complaint made about alleged violation of the criminal law for which we now decide that liability may be imposed." *Id*.

None of these public policy exceptions to the at-will employment doctrine apply here. Plaintiff has failed to adduce any facts to suggest her alleged disagreements with RogersGray's practices rose to the level of "public importance" that is required to state such a wrongful

termination claim. To the contrary, Plaintiff testified that she raised concerns about "the use of driver information," and whether a "particular driver would be able to have driver responsibilities in connection with our clients," which she believed was "not allowed" under the DPPA. SUMF ¶¶ 311-313.

The DPPA prohibits disclosure of drivers' "personal information," 18 U.S.C. § 2721(a)(1), which is defined by the statute as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address ..., telephone number, and medical or disability information ...," *id*. § 2725(3). The DPPA provides fourteen "[p]ermissible uses" for which drivers' personal information may be disclosed, including "use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting." *Id*. § 2721(b)(6). *See Downing v. Globe Direct LLC*, 682 F.3d 18, 21 (1st Cir. 2012). In addition, the statute differentiates between civil and criminal penalties, depending on whether there is "a knowing acquisition, disclosure, or use," of personal information, which could result in civil liability, or "a knowing violation," which could result in criminal fines. 18 U.S.C. § 2724(a) and §2723; *see also Pichler v. UNITE*, 542 F.3d 380, 397 (3d Cir. 2008).

Here, the concerns raised by Plaintiff regarding the DPPA related only to "the *use* of driver information," which does not implicate violations carrying criminal liability. Plaintiff has provided no evidence that she complained of potential criminal conduct. Moreover, in response to the concerns she raised, RogersGray changed its practices. SUMF ¶¶ 311-313. As such, Plaintiff cannot invoke the public policy exception to the general at-will termination rule on the basis of her concerns regarding the DPPA – even more so when she raised those concerns several years prior to her termination. *See also See also Kyle v. Mass. Gen. Hosp.*, 61 Mass. App. Ct. 1118

at*3 (2004) Rule 1:28 decision) (general allegations of possible criminal consequences flowing from improper patient care are not protected); *King v. Driscoll*, 418 Mass. 576, 584 (1994) (alleged wrongful activity of corporation had only a "remote effect" on the public interest and, thus, employee's participation in lawsuit against company not protected by the public policy exception).

Similarly, Plaintiff alleges that, at some point during her employment, she raised concerns about RogersGray's practices related to surplus lines.  SUMF ¶¶ 314-315.  Specifically, Plaintiff testified that she questioned whether RogersGray was complying with the Massachusetts Surplus Lines statute and whether producers were making "a concerted effort to place business with a standard carrier…prior to the submission of that piece of business to a non-admitted carrier."  *Id.*

The Massachusetts Surplus Lines statute, M.G.L. c. 175, § 168, states, in pertinent part:

> A person licensed under this section who negotiates, continues or renews any such contracts of insurance in any unauthorized company and who neglects to make and file the affidavit and statements required by this section, or who willfully makes a false affidavit or statement, or who negotiates, continues or renews any such contracts of insurance after the revocation or during the suspension of his license, shall forfeit his license if not previously revoked and be punished by a fine of not less than $100 nor more than $500 or by imprisonment in the house of correction for not more than 1 year, or by both such fine and imprisonment.

Here, as with her concerns about the DPPA, Plaintiff questioned whether RogersGray's practices concerning surplus lines were in compliance with these requirements, which it was her job to do as the head of Commercial Lines.  SUMF ¶¶ 314-315.  Merely doing her job and questioning the compliance of RogersGray's practices, without more, raises no public policy issue.  *See Nelson v. Anika Therapeutics, Inc.*, No. 09-03231-A, 2011 WL 4056320, at *8 (Mass. Super. Aug. 12, 2011), *aff'd*, 83 Mass. App. Ct. 1126, 985 N.E.2d 874 (2013).

Even if Plaintiff could show that her complaints about the DPPA and surplus lines implicated a public policy issue (which she cannot), Plaintiff's wrongful termination claim still

fails because any connection between raising these issues and her termination is utterly absent from this record.  In fact, Plaintiff testified that she has no basis to believe that the decision to terminate her employment was related to her raising concerns about the DPPA or surplus lines. SUMF ¶¶ 313, 315.  Plaintiff presents no other evidence to suggest that her termination was in any way related to raising either of these concerns.  *See Robert Reiser & Co. v. Scriven*, 130 F. Supp. 3d 488, 497 (D. Mass. 2015) (explaining that a plaintiff raising a wrongful termination claim must "present evidence of a causal connection between the protected activity and adverse employment action").  Any such assertion is merely speculative, and such speculation is not enough to survive a motion for summary judgment. Thus, her wrongful termination claim must fail.

## IV.    BRP GROUP IS NOT LIABLE IN THIS LAWSUIT

Plaintiff's claims in this action are based entirely on conduct alleged to have occurred long before BRP Group acquired RogersGray in an asset purchase transaction in July 2021.  As a result, Plaintiff must show that BRP Group holds successor liability.  Because Plaintiff cannot make such a showing, BRP Group should be dismissed from this lawsuit.

### A.  Plaintiff Bears The Burden of Proving Successor Liability.

When a company acquires another entity by means of an asset purchase, it does not automatically succeed to the obligations of the seller. *Guiffrida v. High Country Inv., Inc*., 73 Mass. App. Ct. 225, 234; 897 N.E.2d 82 (2008). Massachusetts adheres "to traditional corporate law principles that the liabilities of a selling predecessor corporation are not imposed on the successor corporation which purchases its assets unless…the successor expressly or impliedly assumes the liability of the predecessor, or....the transaction is a de facto merger or consolidation...." *Cargill, Inc. v. Beaver Coal & Oil Co*, 424 Mass. 356, 359, 676 N.E.2d 815, (1997), citations omitted.  The plaintiff bears the burden of proving an exception to the "general rule of no successor liability." *CSX Transportation, Inc. v. Tri Cnty. Recycling*, No. 18-CV-12095-DJC, 2019 WL 3225754, at

*5 (D. Mass. July 17, 2019), *citing Nat'l Gypsum Co. v. Cont'l Brands Corp.*, 895 F. Supp. 328,

336 (D. Mass. 1995).  Here, Plaintiff cannot meet that burden, because BRP Group specifically

disclaimed liability for this litigation, and because Plaintiff cannot show that the transaction is a

de facto merger.

**B.  BRP Group Specifically Disclaimed Liability For This Litigation.**

BRP Group acquired RogersGray via an Asset Purchase and Contribution Agreement (the

"APA"), in which BRP Group specifically disclaimed liability for this litigation and did not acquire

liability for the causes of action in the present matter.  SUMF ¶¶ 322-323.  Because there is an

express contract provision to the contrary, successor liability cannot be imposed.  *Brooks v.*

*Specialty Mins., Inc.*, 850 F. Supp. 2d 334, 341 (D. Mass. 2011).  In addition, RogersGray is still

in existence under the name Strategus RG, Inc., and "whatever the reach of successor liability

under the law of Massachusetts, the doctrine has no applicability where, as here, the original

[entity] remains in existence to respond in tort for its alleged negligence." *Roy v. Bolens Corp.*,

629 F.Supp. 1070, 1073 (D.Mass.1986).

**C.  The Asset Sale Transaction Between BRP Group and RogersGray Was Not A De Facto Merger.**

Even if there was reason to disregard the express language of the APA, Plaintiff cannot

show that the asset sale transaction between BRP Group and RogersGray was a de facto merger.

The Massachusetts courts look to the following factors generally to determine whether an asset

sale will be considered a de facto merger, sufficient to impose liability on the purchasing company

for assets (or liabilities) not expressly acquired in the sale:

> 1.  Whether there is a continuation of the enterprise of the selling company so that there is a "continuity of management, personnel, physical location, assets, and general business operations;"

2. Whether there is a continuity of shareholders, resulting "from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation;"

3. Whether the selling company "ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and"

4. Whether the purchasing company assumes the seller's obligations "ordinarily necessary for the uninterrupted continuation of normal business operations."

*Cargill*, 424 Mass. at 360. "No single factor is necessary or sufficient to establish a de facto merger." *Id*. However, to determine whether a de facto merger has occurred, "courts pay particular attention to the continuation of management, officers, directors and shareholders." *Id*., citation omitted. Here, none of the *Cargill* factors weigh in favor of applying the de facto merger to hold BRP liable on claims based on RogersGray's alleged conduct.

The case of *Scott v. NG U.S. 1, Inc.*, 67 Mass. App. Ct. 474, 854 N.E.2d 981 (2006), is instructive here. In *Scott*, the Massachusetts Appeals Court applied the *Cargill* factors and affirmed the trial court's finding that an asset sale between two companies did not constitute a de facto merger even though the purchasing and selling entities were within the same industry and operations continued. In *Scott*, Boston Gas acquired all of the assets of the prior company, including a gas manufacturing plant, including liabilities "as then existing." *Id*. at 984. When Boston Gas purchased the assets, many of the selling company's former employees accepted jobs with Boston Gas, with the exception of key management employees, who were replaced by Boston Gas employees. *Id*. The *Scott* Court placed heavy emphasis on the lack of continuity of management, officers, directors and shareholders after the sale, despite the fact that Boston Gas hired many of the selling company's employees. In response to the plaintiffs' reliance on the maintenance of a similar workforce, the Court held that the fact that some management personnel

and most of the nonmanagement employees were hired by Boston Gas did "not translate into continuity of management." *Scott*, 854 N.E.2d at 991.

Most importantly in this case, there is no continuity of shareholders. This key second factor in *Cargill* analysis weighs heavily in favor of finding of no de facto merger as there is no continuity of shareholders under the asset purchase so that they become an essential part of the purchasing corporation. Courts applying the *Cargill* factors have characterized this factor as "one of the key requirements for a merger under traditional corporate law." *John T. Callahan & Sons*, 266 F. Supp. 2d 208, 227 (D. Mass. 2003) (*quoting Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 693 (1st Cir. 1984). Here, after the asset purchase transaction, the shareholders of the former RogersGray entity owned only about 2% of BRP's stock. SUMF ¶¶ 326-332; *see also Devine & Devine Food Brokers, Inc. v. Wampler Foods Inc.*, 313 F.3d 616, 619 (2002) (no de facto merger where the shareholders of the selling entity had received 10% of the stock of the acquiring entity in the transaction); *American Paper Recycling Corp. v. IHC Corp.*, 707 F. Supp. 2d 114, 121 (D. Mass. 2010) (holding that there was no continuity of shareholders, for purposes of the de facto merger analysis, where the shareholders of the selling entity received a 3.2% interest in the acquiring entity); *see generally Dayton v. Peck, Stow, & Wilcox Co.*, 739 F.2d 690, 693 (1st Cir. 1984) (holding that continuity of shareholders is one of the "key requirements" for application of the de facto merger doctrine). Thus, any stock received by RogersGray shareholders in BRP Group does not meet the threshold established by law.

As to the other *Cargill* factors, those also weigh in favor of finding the de facto merger doctrine does not apply. First, there was no continuity of management between RogersGray and BRP Group. SUMF ¶¶ 326-332. As a result of the asset purchase transaction, the management structure of RogersGray was dissolved and all the senior managers of RogersGray, including

former owners Dave and Mike Robinson, began reporting to senior managers of BRP.  *Id.* Former senior management at RogersGray no longer have budget authority and must get approvals from their superiors at BRP.  *Id.* Next, as is common practice in such acquisitions, all employees were terminated by RogersGray when the acquisition closed.  *Id.* Any employees who remained were newly hired by BRP following the acquisition.  *Id.* Accordingly, this "does not translate into continuity of management" sufficient to establish a de facto merger under Massachusetts law. *Scott*, 854 N.E.2d at 991.  Further, while there was continuity of service for RogersGray's customers, nearly all of RogersGray's business operations changed following the acquisition. SUMF ¶¶ 326-332.  Payroll, benefits, the agency management system used by RogersGray, and contracts with vendors all changed. *See Scott*, 854 N.E.2d at 991 (uninterrupted services to customers after asset purchase "do not, of themselves, render the purchase a de facto merger or continuation."). In addition, there is a complete divergence of officers and directors between the companies at issue—none of the officers or directors of RogersGray became officers or directors of BRP, no board seats were given, and no corporate titles were awarded by BRP to RogersGray's principals as a result of the asset purchase transaction. SUMF ¶¶ 326-332.  The application of the present facts to the factors set forth in *Cargill* demonstrates that BRP Group is not liable for incidents that occurred during Plaintiff's employment with RogersGray under a de facto merger theory, and accordingly, BRP is entitled to dismissal and summary judgment in its favor.

Respectfully submitted,

*/s/ Amy Ventry-Kagan*

Amy Ventry-Kagan (BBO No. 569417)
Ellen Lemire (BBO No. 670994)
**LITTLER MENDELSON, P.C.**
One International Pl., Suite 2700
Boston, MA 02110
Tel: (617) 378-6034
aventry@littler.com
elemire@littler.com

*Attorneys for Defendants*

Dated:  May 25, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2023, a copy of foregoing document was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

*/s/ Amy Ventry-Kagan*

Amy Ventry Kagan

4883-9481-7382.1 / 110750-1002