UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TERESA O'SULLIVAN,                          *
                                            *
          Plaintiff,                        *
                                            *
     v.                                     *
                                            *
STRATEGUS RG, INC. F/K/A                    *        Civil Action No. 22-cv-10240-ADB
ROGERSGRAY, INC. and BRP GROUP              *
INC.,                                       *
                                            *
          Defendants.                       *
                                            *

## <u>MEMORANDUM AND ORDER</u>

BURROUGHS, D.J.

     Plaintiff Teresa O'Sullivan ("O'Sullivan" or "Plaintiff"), a former employee of

Defendants Strategus Rg, Inc. f/k/a RogersGray, Inc. ("RogersGray" or "the Agency") and BRP

Group Inc. ("BRP Group") (collectively, "Defendants"), alleges discrimination and retaliation in

violation of federal and state statutes and the common law.  [ECF No. 1 ("Complaint" or

"Compl.")].  Pending before the Court is Defendants' motion for summary judgment on all

claims.  [ECF No. 36].  For the reasons set forth below, the motion is <u>GRANTED</u> in part and

<u>DENIED</u> in part.

## I.  BACKGROUND

### A.  Factual Background

Except as otherwise noted, the following facts are either not in dispute or stated in the light most favorable to O'Sullivan, the non-movant.  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003).[1]

---

[1] The Court draws the facts from the parties' combined Rule 56.1 statement of material facts, which consists of Plaintiff's Response to Defendants' Statement of Undisputed Material Facts, [ECF No. 50 at 1–96], Defendants' Responses to Plaintiff's Statement of Additional Material Facts, [ECF No. 56], and documents referenced therein.  The portions of the Defendants' Statements of the Facts, [ECF Nos. 38, 50], not specifically controverted by O'Sullivan, with support in the record, [ECF No. 50], are deemed admitted.  See Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) ("In the event that a party opposing summary judgment fails to act in accordance with the rigors that [a local rule governing summary judgment] imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated.").

Defendants argue that many of the facts they put forth should be deemed admitted where O'Sullivan's responses rely only on her own "self-serving affidavit" to establish a genuine dispute.  See [ECF No. 55 at 3; ECF No. 56].  It is true that "[w]here a party has given 'clear answers to unambiguous questions' in discovery, that party cannot 'create a conflict and resist summary judgment with an affidavit that is clearly contradictory,'" Tang v. Citizens Bank, N.A., 821 F.3d 206, 217 n.11 (1st Cir. 2016) (quoting Escribano-Reyes v. Prof'l Hepa Certificate Corp., 817 F.3d 380, 386–87 (1st Cir. 2016)), "unless there is a 'satisfactory explanation of why the testimony [has] changed,'" Escribano-Reyes, 817 F.3d at 386 (1st Cir. 2016) (quoting Hernandez–Loring v. Universidad Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000)).  Likewise, "[t]o the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient."  Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 315 (1st Cir. 2016) (quoting Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000)).  That said, "a 'party's own affidavit, containing relevant information of which [s]he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.'"  Santiago-Ramos, 217 F.3d at 53 (quoting Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997)); see also Velázquez-García v. Horizon Lines of P.R., Inc., 473 F.3d 11, 18 (1st Cir. 2007) (holding that self-serving testimony is sufficient to survive summary judgment so long as "the nonmovant's deposition testimony sets forth specific facts, within [their] personal knowledge, that, if proven, would affect the outcome of the trial").  Thus, so long as O'Sullivan's affidavit statements (1) do not without explanation directly contradict clear answers she gave in discovery, and (2) include sufficient factual specificity, the Court will consider them.  See Snell v. Neville, 998 F.3d 474, 490 (1st Cir. 2021).

1. <u>Management Structure of RogersGray, Inc.</u>

During the period at issue in this case, RogersGray was "a family-owned and run insurance agency that sold and serviced both personal insurance and commercial insurance products."[2]  [ECF No. 50 ¶ 1].  Its principal owners were brothers David ("Dave") and Michael ("Mike") Robinson.  [ECF No. 50 ¶¶ 3–7].  Between January 1, 2015, and July 1, 2021, Dave was President and Chief Executive Officer ("CEO") of RogersGray, and Mike served as its Chairman.  <u>See</u> [<u>id.</u> ¶ 5].  The brothers "divided up oversight and management of the [Agency]." [<u>Id.</u> ¶ 6].  Dave supervised "human resources, operations, and employee benefits," [<u>id.</u>], and Mike "had management oversight of finance, [information technology], marketing and sales," [<u>id.</u> ¶ 7].

The Agency was divided up into "personal insurance, commercial (or business) insurance, and employee benefits insurance products."  [ECF No. 50 ¶ 10].  "RogersGray's commercial insurance business was, generally, divided up into parts: sales and service."  [<u>Id.</u> ¶ 11].  On the sales side, "Account Executives (often referred to as producers) were responsible for identifying new business customers with insurance needs, identifying the right insurance options for their businesses, [and] securing that insurance."  [<u>Id.</u>].  "Service was responsible for ongoing service of the accounts from a certification, to change in business, to explanation of coverage."[3]  [<u>Id.</u>].  O'Sullivan was employed on the service side.  [<u>Id.</u> ¶ 27].

---

[2] As an insurance agency, rather than an insurance carrier, "RogersGray does not sell its own insurance policies but rather, assists its clients in finding appropriate personal and business insurance policies from various carriers, and assists its clients with issues throughout the life of their policies."  [ECF No. 56 ¶ 3].

[3] The parties dispute which part of the business was responsible for renewals.  [ECF No. 50 ¶ 11].

### 2. 2015: O'Sullivan is Hired

"In mid-2015, the commercial lines business (also referred to as 'CL' or 'business insurance') comprised approximately 40% of the revenue to the [Agency]" and, at the time, "was seen as a significant area for future growth and expansion." [ECF No. 50 ¶ 14]. The Robinsons determined that new leadership, "someone with a deeper knowledge of business client needs and more agency experience," "was needed for Commercial Lines,"[4] [id. ¶¶ 15–16]. O'Sullivan, then fifty-five years old, was offered the position on September 8, 2015, and commenced her employment on September 29, 2015. [Id. ¶¶ 19, 23–24]. "In March 2016, less than six months after starting her employment at RogersGray, [O'Sullivan] was promoted . . . to Vice President." [Id. ¶ 29].

### 3. 2016–19: O'Sullivan Serves as Director of Commercial Lines

"As the Director, Commercial Lines, [O'Sullivan] led the service teams of approximately 60 employees — including managers and frontline employees." [ECF No. 50 ¶ 27]. She initially reported directly to Dave Robinson, [id.], but after RogersGray hired Erin Schaaf ("Schaaf"), who was fifty years old at the time, to be its Chief Operating Officer ("COO") in 2016, O'Sullivan began reporting to Schaaf in approximately January 2017.[5] [Id. ¶ 32; ECF No. 39 ¶ 14].

---

[4] Until O'Sullivan's hire, the CL had been led by a male Director. [ECF No. 50 ¶ 15].
[5] The parties dispute how soon after Schaaf joined the company she assumed the role of COO. [ECF No. 50 ¶ 32].

>           *a.    2016–19 Performance Reviews*

O'Sullivan's performance reviews were generally positive, particularly with respect to

her technical expertise.[6]  [ECF No. 50 ¶¶ 34, 44].  They also consistently identified issues with

---

[6] 2016 Performance Review.  O'Sullivan received "Meets Expectations," "Sometimes Exceeds Expectations," or "Exceeds Expectations," in every review category except "Communication," in which she received "Sometimes Meets Expectations."  [ECF No. 50-6 at 7–8].  The review, completed by Dave Robinson, noted that "[t]he division has improved drastically because of [O'Sullivan's] efforts[;] [that] [her] hard work, dedication, and commitment have been the biggest contributors to this success[;]" that she was "very motivated and ha[d] very successfully identified the areas [the Agency] need[ed] to improve in the division[;]" and that her "motivation w[ould] make 2017 the year where CL becomes the best run operational division in the agency." [ECF No. 40-4 at 66].

2017 Performance Review.  Again, O'Sullivan received "Meets" to "Exceeds Expectations" in all review categories.  [ECF No. 40-4 at 74–79].  The overall summary of O'Sullivan's performance stated:

> [O'Sullivan], [i]t is a pleasure to work with you and see the great progress you have made over the last 12 months.  The commercial division is very stable and is positioned for future development. These results are because of you and your hard work.  Great job and thank you for working so hard and being so effective.  You have worked very hard at improving your communication over the last 12 months and have done a good job. There are still some improvements to make but I have no doubt you will be there shortly. Thank you for all of your hard work and dedication. It is a pleasure to have you on the team.

[Id. at 77].

2018 Performance Review.  O'Sullivan met or exceeded expectations in all review categories. See [ECF No. 40-4 at 85–93].  The review, completed by Schaaf, noted that "[O'Sullivan]'s knowledge and experience in the commercial lines is unmatched in the agency.  She has the breadth and depth of knowledge that make her incredibly valuable and she willingly shares her knowledge."  [Id. at 85].  In her overall assessment, Schaaf stated that O'Sullivan "[wa]s amazing for hanging in there and getting so much accomplished in the craziest fo[u]r [sic] years (from a personnel perspective)[;]" and "ha[d] made great hires to fill all the vacancies that ha[d] come about . . . [that with O'Sullivan's] leadership . . . w[ould] come together to be a great team."  [Id. at 89].  She stated that she could not "thank [O'Sullivan] enough for sticking with it through the adversity" and recognized O'Sullivan as "an extremely valuable member of the leadership team at R&G."  [Id.].

her communication style and conflicts with the sales team but noted that O'Sullivan was making

progress in addressing those issues.[7]  [Id. ¶¶ 35, 42, 44]; see also [ECF No. 40-4 at 65, 74–76,

85–86, 94].

---

2019 Performance Review.  O'Sullivan's review again recognized her "very deep experience and knowledge applicable to the CL space."  [ECF No. 40-4 at 94].

[7] 2016 Performance Review.  While O'Sullivan's "very direct" communication style and tendency to "leave people feeling put off" through her "aggressive and rigid" nature were noted concerns, the review also stated that it seemed unlikely this would be "a long term issue given the progress [O'Sullivan] ha[d] made."  [ECF No. 40-4 at 65].  The review also stated she could improve in "sincerity[,]" explaining that O'Sullivan's tendency to "wear [her] feelings on [her] shoulders," could "cause reactions in other people where they will shut down and feel underappreciated."  [Id. at 67].  Finally, the review stated that O'Sullivan seemed "challenged by the producer role and . . . [RogersGray's] culture['s] . . . strong focus on sales," which had "put off a number of producers" but that she had "done a great job improving in this area."  [Id.].

2017 Performance Review.  The review again recognized O'Sullivan's "direct and thorough" communication style as an area of concern and where she could "work to maintain professionalism," particularly with regard to "improv[ing] [her] relationship with producers." [ECF No. 40-4 at 74].  The review indicated that "[O'Sullivan should] work to maintain professionalism in all meetings and remain positive in a consistent manner."  [Id.].  That said, the review stated that O'Sullivan "should be commended on the progress [she has made]," and that she had "done a good job."  [Id. at 74, 77].  In particular the review commended O'Sullivan for "soften[ing] the edges in her approach."  [Id. at 74].

2018 Performance Review.  O'Sullivan was praised for "communicat[ing] very clearly in oral and written forms, most especially with her service team and managers," and "work[ing] diligently to improve her communications with the Sales team members."  [ECF No. 40-4 at 85].  Likewise, the review recognized that O'Sullivan was "working to change any leftover perception that she [didn't] appreciate the Sales team and she [would] continue to be cognizant of that."  [Id. at 86].  O'Sullivan's self-evaluation reflected her continued commitment "to be cognizant of interruptions and facial expressions."  [Id. at 85].

2019 Performance Review.  As to communication, the review explained that O'Sullivan's "communication [was] improving," and she had "worked diligently with a coach in 2019," but also that "she will continue to focus on her style vs. that of others as well as taking enough time to communicate fully when communicating in writing."  [ECF No. 40-4 at 94].  The review again indicated that "[h]er communications can be direct, some might even say abrupt."  [Id.].  O'Sullivan was also directed to keep in mind that "emails that are forwarded without explanation

For example, in his deposition testimony, Dave explained that (1) he told Schaaf O'Sullivan was "a very knowledgeable insurance technician who has a difficult time interacting with others and in her communication style," and (2) that he observed that O'Sullivan could be "[v]ery curt, very abrupt," that her body language did not "hide the way she fe[lt]," that she expressed the view that salespeople were "overpaid idiots," and that she could be "abrasive," "harsh," and "rude" in her interactions with RogersGray salespeople.  [ECF No. 50-3 at 135:23–136:5, 141:24–142:7; ECF No. 50 ¶¶ 40–41].

Schaaf also testified that she considered Plaintiff a "hard worker," with "fabulous knowledge of the commercial market, policies, coverages," including carriers.  [ECF No. 50-2 at 53:21–23; ECF No. 50 ¶ 71].  In her opinion, as of 2019, O'Sullivan's job performance was "overall, . . . very good," although she "had started to notice . . . some areas in which she could improve but [was] definitely getting to know her strengths and her opportunities for improvement very – very well at that point."  [ECF No. 50-2 at 50:16–21].  Specifically, according to Schaaf, those opportunities for growth included:

> [O'Sullivan's] communication skills, um, she didn't have a poker face. Anything that she thought showed on her face. She could be, um, curt or even cryptic in her emails . . . if things got hectic, she would default to banging out e-mails, and those e-mails were not always, um . . . well, decipherable. . . .  So if you were talking to Teresa and she didn't agree, you very often could tell before she even started to talk. . . . a negative thought that ran through her head that maybe didn't add to the conversation, but it would come out.

[Id. at 51:2–5, 9–11, 17–19, 52:15–17; ECF No. 50 ¶ 63].

---

or one/two word emails can be misunderstood," and to "take the time to carefully consider all communications prior to initiating."  [Id.].

Jeff Reilly ("Reilly") became the Chief Operations Officer for commercial lines, in addition to his responsibilities as Chief Sales Officer, sometime in July 2020.[8]  [ECF No. 50 ¶ 227; ECF No. 40-4 at 44:4–13; <u>see also</u> [ECF No. 50-2 at 129:6–8].  He testified that as of 2019, O'Sullivan lacked the "[]ability to communicate effectively and seek consensus around issues to the point where it became . . . very difficult for anyone to interact with her and move any issue forward[,]" [ECF No. 50-1 at 117:4–8; ECF No. 50 ¶ 82], and that she also had "poor body language . . . [was] very defensive, very short . . .  very guarded . . . not a good teammate . . . [not] focused on the customer resolving an issue . . . [and, instead] focused on what . . . she felt was the right thing from a technical standpoint."  [ECF No. 50-1 at 121:4–8, 123:4–8; ECF No. 50 ¶ 83].

> b.  *O'Sullivan's Conflicts with the Sales Team and Concerns Regarding Regulatory Compliance*

As noted in her performance reviews, <u>see</u> <u>supra</u>, O'Sullivan had conflicts with individuals from the sales side of the Commercial Lines division, [ECF No. 50 ¶ 45], although O'Sullivan maintains (and Defendants do not dispute) that such conflicts are typical and reflective of an industry-wide dichotomy between sales and service, [<u>id.</u>; ECF No. 56 ¶ 8]; <u>see also</u> [ECF No. 50-2 at 73:12–22].  The parties dispute whether other specific factors, such as O'Sullivan's communication style and attitude towards the sales team, contributed to these conflicts.  [ECF No. 50 ¶¶ 61–62, 64–66, 68–69, 72, 81–85].[9]

---

[8] Once Schaaf was terminated in July 2020, [ECF No. 50-2 at 129:6–8], O'Sullivan began reporting to Reilly, [ECF No. 50 ¶ 228].

[9] For example, Schaaf testified there was tension specifically between O'Sullivan and Michael Duffley, Plaintiff's counterpart on the sales side.  [ECF No. 50 ¶ 28; ECF No. 40-8 at 34:13–35:24].  Schaaf and others worked to smooth relations between O'Sullivan and Duffley, [ECF No. 50 ¶¶ 61–62, 70]; O'Sullivan and Duffley did begin "working better together" and "found some common ground," [ECF No. 50-3 at 153:19, 154:6–9].

O'Sullivan points to two specific "conflicts." [10]  Namely, several years prior to her termination, O'Sullivan raised concerns that the sales team had violated the federal Driver's Privacy Protection Act, 18 U.S.C. §§ 2721–25 (the "DPPA").  [ECF No. 50 ¶ 308; ECF No. 56 ¶ 9].  And then in mid to late 2019, she discussed with members of the sales team, including Mike Robinson, a concern that they were violating the Massachusetts Surplus Lines Statute, Mass. Gen. Laws ch. 175 § 168.  [ECF No. 50 ¶ 311; ECF No. 56 ¶¶ 13–17].

### c.    O'Sullivan's Executive Coaching Sessions

In 2019, "[a]t Schaaf's suggestion and with Mike Robinson's approval, the agency hired and paid for an executive coach," Marsha Egan ("Egan"), "to help Plaintiff" with her communication style.  [ECF No. 50 ¶ 48; ECF No. 56 ¶ 19; ECF No. 57-4 at 6:19–25, 7:1–6, 12–13]. [11]  Egan "coached [] O'Sullivan to be conscious of how, as a woman, her communications could come across as threatening to men and could make them feel as though their authority was

---

[10] Defendants dispute that this constituted a conflict, noting that when O'Sullivan raised her concerns, the Agency changed its practices.  [ECF No. 56 ¶ 9; ECF No. 50 ¶ 309].

[11] In August 2019, an employee relayed to her direct supervisor as well as Allison McEachern, then RogersGray's Chief People Officer, that O'Sullivan had made disparaging remarks about people from the southern United States that were "very stereotypical" and an "unfair generalization."  [ECF No. 40-14 at 2–3; ECF No. 50 ¶¶ 54–57].  The parties dispute whether or not this was one example of O'Sullivan using "harsh language" in the workplace.  [ECF No. 50 ¶ 57].

being challenged."[12] [13]  [ECF No. 56 ¶ 19].  O'Sullivan acknowledged that Egan was helpful,
[ECF No. 50 ¶ 49], and notes that O'Sullivan took in relation to these sessions say things such as
"Women – feel. Men – do" and "I pit myself against someone and make it personal.  Making
others the villain," [ECF No. 40-13].

       4.   Late 2019-August 2020: Commercial Lines is Reorganized and O'Sullivan is
           Reassigned to a New Role

By late 2019, RogersGray was still committed to continuing to grow the Commercial

Lines portion of the business.  According to Schaaf, the business took "the opportunity to

consider the structure from the ground up" to "be ready to scale for potential continued growth."

---

[12] Defendants argue that Plaintiff's affidavit-statements regarding her coaching sessions with
Marsha Egan are contradictory to her prior sworn testimony and, as such, these statements
should be "disregard[ed] for purpose of the instant Motion."  [ECF No. 56 ¶ 19].  Specifically,
Defendants assert that "Plaintiff testified that RogersGray provided her with an executive coach,
which she believed 'was an opportunity to grow and improve on [her] communication skills, and
[she] thought it was a wonderful opportunity[]' and "further testified that working with the coach
turned out to be a positive experience."  [Id.].  The Court does not find that O'Sullivan's affidavit
statements are "clearly contradictory" to this testimony; rather, her affidavit adds details to her
deposition testimony.  See Gillen v. Fallon Ambulance Serv., 283 F.3d 11, 26 (1st Cir. 2002) ("A
subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a
previous deposition is entitled to consideration in opposition to a motion for summary
judgment.").  It can both be true that Egan offered some less helpful feedback (such as by
"coach[ing] O'Sullivan to be conscious of how as a woman, her communications could come
across as threatening to men and could make them feel as though their authority was being
challenged," [ECF No. 56 ¶ 19]), and that nonetheless, overall, O'Sullivan saw the coaching as
"a positive experience," and "a wonderful opportunity," [ECF No. 57-4 at 7:14–17].  Indulging
all reasonable inferences in Plaintiff's favor, Cochran, 328 F.3d at 6, there is no contradiction
and no other reason to disregard Plaintiff's affidavit statements at this stage.

[13] Additionally, Egan made several statements about how women should treat men in the office:
(1) "that in traditional roles women 'feel' and men 'do' and that [O'Sullivan] needed to be nice,
not right," (2) "that [O'Sullivan's] direct and businesslike manner could put men on the
defensive and make them regard her as their adversary, and that [O'Sullivan] needed to find
ways to make them feel appreciated," and (3) "that instead of telling a male colleague that he is
not doing something correctly, that O'Sullivan should pretend he was her 'child' and relate to
him in that way."  [ECF No. 56 ¶ 20].

[ECF No. 50 ¶ 60].  Seemingly to this end, the Agency hired Reilly to serve as Chief Sales Officer, although he had no prior experience in the insurance industry.  [ECF No. 56 ¶ 25].

By this time, RogersGray, and Schaaf in particular, had expended time and energy working with Plaintiff on her relationship with Duffley, who was her counterpart in commercial sales.  [ECF No. 50 ¶ 70; ECF No. 50-2 at 100:1–9].

In either late December or early January 2020,[14] RogersGray leadership (Dave Robinson, Mike Robinson, Jeff Reilly, and Erin Schaaf) had a meeting, referred to as a "whiteboarding session," in which they discussed "challenges [for] the commercial lines business" and its reorganization in order to facilitate its growth potential.  See [ECF No. 50 ¶¶ 73–75; ECF No. 50-2 at 44:11–18, 46:17–18, 47:13–48, 56:1–9].

As a result of the "whiteboarding session," the company decided to hire an "Assistant Director of Business Insurance" who would report directly to O'Sullivan, who would remain head of Commercial Lines as "Director of Strategic Initiatives and Training."[15]  [ECF No. 56 ¶ 49; see also [ECF No. 50 ¶¶ 76–77].  According to Schaaf, it was intended that the Assistant Director would assume some of O'Sullivan's day-to-day management responsibilities, to free her up to focus on "the strategic and the foundational – the big heavy-hitting things that needed to progress in the department," [ECF No. 50 ¶ 77; ECF No. 50-2 at 44:14–16], that is, "the more

---

[14] The parties dispute whether the whiteboarding session occurred before or after New Year's in January 2020.  [ECF No. 50 ¶ 74].

[15] The parties dispute whether the reorganization plan gave Plaintiff supervisory authority over both the "strategic initiatives" and the "day-to-day management of Commercial Lines," whether Plaintiff was supposed to retain Commercial Lines supervisory authority on a temporary basis, or whether the plan had always been for her to lose all direct reports in Commercial Lines.  [ECF No. 50 ¶¶ 75–78].  Since the witnesses with personal knowledge of this reorganization plan offered differing and sometimes conflicting accounts of what the reorganization plan was, see [id.; see also ECF No. 56 ¶¶ 38–40], the Court, taking such "evidence in the light most flattering to [O'Sullivan]," Cochran, 328 F.3d at 6, must at this stage credit Plaintiff's version.

strategic and important and meaty things that the department needed," [ECF No. 50-2 at 67:6–8].

All those involved in the decision to relieve O'Sullivan of some of her day-to-day

responsibilities were deposed (Reilly, Dave Robinson, McEachern, and Schaaf), and testified

that they believed that the new role would suit O'Sullivan's strengths.  [ECF No. 50 ¶ 96].

O'Sullivan learned of her new title from Schaaf on January 13, 2020.  [ECF No. 50

¶ 106].  After also talking to Dave Robinson about her new title, O'Sullivan drafted a

handwritten note to herself, stating:

> I was not happy about it.  I loved my job and I was very good at it.
> I stopped by DTR's [Dave Robinson's] office + told him I didn't
> understand the thought process behind this decision.  He stated "it
> will free you up to do the important work that the division needs."
> It takes advantage of the knowledge that you have + will enable you
> to work on the high level work that needs to be done in the division.

[Id.; ECF No. 40-16].  "At the time of her January 13, 2020 conversations with the leadership

team (Dave Robinson, Schaaf and McEachern) about the change in role and how it capitalized on

her strengths, Plaintiff did not believe that there was any ulterior motive to the decision."  [ECF

No. 50 ¶ 119].

On January 30, 2020, Schaaf announced that Valerie Tawa ("Tawa") had been selected to

fill the position of Assistant Director.  [ECF No. 50-15 at 2].  Tawa is fifteen years younger than

O'Sullivan and had no prior experience working for an insurance agency.  [ECF No. 50 ¶ 136;

ECF No. 56 ¶¶ 33–34].[16]  O'Sullivan was not involved in selecting Tawa for the Assistant

Director role even though the new reorganization plan, as annotated and shared with her by

Schaaf, had this individual reporting directly to her.  [ECF No. 56 ¶¶ 49–51].

---

[16] O'Sullivan had previously considered Tawa as too inexperienced for a more junior position.
[ECF No. 56 ¶ 52].

In the January 30 announcement, the Agency declared that O'Sullivan would retain her title of "Director of Business Insurance." [ECF No. 50-15 at 2]. Although O'Sullivan was to still receive the same pay as before, [ECF No. 50 ¶ 91], she was "not happy" with the change, [ECF No. 50 ¶ 106].

Tawa, who began working at RogersGray in February 2020, [ECF No. 50 ¶ 134], perceived Plaintiff as cold and standoffish, [id. ¶ 157], compounded by O'Sullivan saying to Tawa, "I don't know why you're here; I don't know what you're supposed to do; I don't[] know what your job is," [id. ¶ 158; see also ECF No. 50-16 at 15:5–6]. By February 2020, it is undisputed that Tawa's responsibilities as Assistant Director included directly overseeing the managers of Commercial Lines, a responsibility that had previously been O'Sullivan's. [ECF No. 50 ¶ 141].

In March 2020, Tawa expressed to Schaaf that she was having difficulty acclimating to her position. [ECF No. 50 ¶ 161]. Although Tawa attributed this to O'Sullivan's lack of availability and help, [ECF No. 50-16 at 16:4–23], which the parties dispute (O'Sullivan avers that she "worked diligently and in good faith to provide [Tawa] whatever support [she] could in acclimating to her role[,]" [ECF No 50-5 ¶ 22]), Tawa admitted there was a steep learning curve and that she "struggl[ed] . . . learning [the] language" of the insurance agency (as compared to her prior role with an insurance carrier). [ECF No. 50-16 at 15:20, 16:1–2].

Sometime that spring, Plaintiff was nominated for and ultimately received a "Leadership Award" from RogersGray. [ECF No. 50 ¶¶ 178; ECF No. 56 ¶ 60].[17] It is undisputed that both Schaaf and Dave Robinson supported giving the award to O'Sullivan, though the parties dispute

---

[17] Once nominations are in, the Agency's management team votes to determine who will win these "Circle of Excellence" awards. [ECF No. 50 ¶ 177].

Robinson's motives and the reasons O'Sullivan was ultimately given the award.  [ECF No. 50 ¶¶ 178–82].  Following the award, Robinson sent Plaintiff an email stating that the "award could not have gone to a more deserving person and . . . everyone feels that way, not just me."  [ECF No. 56 ¶ 61].

By June 2020, Tawa expressed her increasing frustration with O'Sullivan to both Dave and Reilly, [ECF No. 50 ¶ 199], though Plaintiff disputes that Tawa's frustration resulted from her actions, [id. ¶¶ 192–95].  Specifically, based on Dave's notes about a conversation with Tawa, Tawa felt "bullied" by O'Sullivan.  [Id. ¶ 199].  Schaaf, McEachern, and Dave Robinson had a meeting with O'Sullivan to discuss Tawa's concerns in June.  [Id. ¶ 203; ECF No. 40-4 at 32:13–33:2].  Soon thereafter, Tawa began reporting directly to Schaaf instead of O'Sullivan, [ECF No. 50 ¶ 212], which Schaaf, Plaintiff's supervisor at the time, understood was intended to be a temporary measure, [id.; ECF No. 50-2 at 80:15–21].

5. August 2020: O'Sullivan's New Title: Director of Commercial Lines Management/ Director of Strategic Initiatives

In July, Schaaf was terminated, [ECF No. 50-2 at 9:21–22], and O'Sullivan began reporting directly to Reilly, [ECF No. 50 ¶¶ 227–28].  On August 3, 2020, Plaintiff met with Reilly, now her direct supervisor, who informed her that she would no longer be Director of Commercial Lines and instead, would be "Director of Commercial Lines Project Management."[18]  [ECF No. 40-4 at 50:15–20; 117–19; ECF No. 50 ¶¶ 236, 238; ECF No. 56 ¶ 65].  The job description provided by Reilly confirmed that the "[d]irection of service managers and service staff," and "career pathing for all," would be left to "Senior Manager, CL

_____

[18] Although the job description presented to O'Sullivan on August 3 references "Director of Commercial Lines Project Management," [ECF No. 40-4], it appears that the parties ultimately settled on the title "Director of Strategic Initiatives" by late September, see [ECF Nos. 50-5 ¶ 32; 50-28 at 3; 50-29].

[Commercial Lines] OPS," not to O'Sullivan's position.  [ECF No. 40-4 at 119].  Some employees at the Agency understood this change to be a demotion, [ECF No. 50-26 at 2], even though O'Sullivan retained both her "director" title and her same salary level, [ECF No. 50 ¶ 91].  On August 6, 2020, Reilly sent an email to O'Sullivan to "make sure [she was] 100% clear on [her] new role . . . and importantly [to] make sure [she was] committed to performing the role." [ECF No. 50 ¶ 243].  Around that time, Dave Robinson, emailed her, asking how she felt "about all of the changes going on," [ECF No. 40-38 at 1], and Plaintiff responded that she hadn't "come to a place of peace with the decisions," and wasn't ready to discuss her feelings just yet, [ECF No. 40-39].

A draft organization chart sent by Mike Robinson to Tawa on August 28, 2020, labelled Tawa as "Director of Business Insurance," O'Sullivan's former title.  [ECF No. 50-28 at 3; ECF No. 50-15 at 2].

Between August 2020 and December 2020, Plaintiff privately expressed her own negative views of Tawa in text messages with Patty Clendenden, an employee who reported to Tawa.  [ECF No. 50 ¶¶ 217–20].  In these messages, O'Sullivan referred to Tawa as "a hideous beast," "a human sized waste disposal [p]lant," a "fat red c*nt," and "an ugly stupid bitch." [ECF No. 50 ¶¶ 220–21].

6.   September-December 2020: O'Sullivan Serves as Director of Strategic Initiatives

Although the intent and purpose behind its creation is disputed by the parties, in September 2020, Tawa and Reilly created a spreadsheet that color-coded older employees in the Commercial Lines division to determine who would "retire soonish."  [ECF No. 56 ¶ 35].

The evidence indicates that by around that same time, late 2020, O'Sullivan began to be excluded from email chains and meetings involving the future of the Commercial Lines

department.  [ECF No. 56 ¶ 80; ECF No. 50-33].  O'Sullivan asked that she be included in these

meetings since they involved discussions about carrier incentives, [ECF No. 56 ¶ 81; ECF No.

50-34], and the job description sent to her by Reilly noted that it was her role to "maximize

participation in incentives," [ECF No. 40-4 at 117], but Mr. Reilly responded that "as we look at

your role I think we may shift this responsibility," [ECF No 50-34 at 2].

       7.   November 2020: O'Sullivan Submits Part of the Self-Evaluation

      In late 2020, as part of the Agency's new performance evaluation system, which was

operated by a company called TalentGuard, [ECF No. 56 ¶ 83], employees were expected to

perform a two-part self-evaluation, [id. ¶¶ 84–85.  On November 14, 2020, O'Sullivan

submitted part of her two-part self-evaluation, the "Competencies Panel," [Id. ¶ 88], in which she

stated:

> As a leader, I can be direct and forceful, innovative, and imaginative,
> analytical, and calculating.  I try to balance quickness of thought and
> action by my desire to explore all the options.  Mark Carrick and
> Jim Lopes have a similar communication style, but it does not
> appear to have hindered their success at the agency.  I have been
> judged harshly for my communication style because I am direct; I
> attribute this judgment to gender bias. . . .
>
> Although Jeff [Reilly] indicated in August that it was my "failed
> leadership" that led to the "mess" in Business Insurance, there is
> nothing in my personnel file to substantiate this claim.  The policy
> of the Agency is to make employment decisions based on legitimate
> business considerations, without regard to personal bias.  This
> policy is presumed to apply to all aspects of employment, including
> hiring, training, performance assessments, promotions, discipline,
> and termination.

[ECF No. 50-36 at 4, 7; ECF No. 56 ¶ 90].  It is undisputed that when panels, such as the

competency panel submitted by O'Sullivan, were completed, an employee's direct supervisor

would receive an automatic email notification containing a link for the manager to view the

panel submitted by the employee.  [ECF No. 56 at 43, ¶ 80 [sic]].[19]  The parties dispute whether the system was operating properly at the time O'Sullivan submitted her panel and whether anyone at RogersGray had knowledge of these statements prior to Plaintiff's termination.  [ECF No. 56 at 43, ¶¶ 82, 83 [sic]; ECF No. 50 ¶ 315]; see also [ECF Nos. 50-39; 50-41].[20]

        8.   December 2020: O'Sullivan is Terminated

The parties further dispute whether O'Sullivan ever came to embrace and commit to her new role, [ECF No. 56 ¶¶ 76–77; ECF No. 50 ¶¶ 273–75, 277–80], and when the decision was made to terminate O'Sullivan, [ECF No. 56 at 45, ¶¶ 86–87 [sic]].  It is undisputed, though, that O'Sullivan met with David Robinson on November 24 and Reilly on November 30, [id. at ¶¶ 86–87 [sic]], and that on December 3, 2020, she met with McEachern and Reilly who informed her that RogersGray was terminating her employment.  [ECF No. 50 ¶ 281; ECF No. 56 at 44, ¶ 85 [sic]].[21]

On December 11, 2020, McEachern communicated to Reilly that O'Sullivan had referenced "gender bias" when discussing her communication style in her 2020 self-review.  [ECF No. 56 at 45, ¶ 88 [sic]].

        9.   2021: O'Sullivan's MCAD Complaint and Post-Termination Alleged Spoliation of Evidence

In June 2021, O'Sullivan filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") against RogersGray, alleging age and gender discrimination and retaliation.  [ECF No. 50 ¶ 315; ECF No. 50-42 at 2].

---

[19] Plaintiff's Statement of Additional Material Facts contains misnumbered paragraphs, which Defendants denote with [sic] in their response.  See [ECF No. 56, starting on p. 42].  The Court adopts Defendants' approach and for further clarity adds page numbers.

[20] The email Plaintiff cites in support of her argument that Reilly accessed the TalentGuard system on November 15, 2020, [ECF No. 50-39], is in fact dated December 15, 2020, [id. at 2].

[21] When asked whether her performance had been unsatisfactory, McEachern, according to Plaintiff's notes, answered "[n]o, it's just not working out."  [ECF No. 56 at 44, ¶ 85 [sic]].

On August 13, 2021, O'Sullivan reached out to TalentGuard to confirm that she had in fact submitted part of her self-evaluation in 2020.  [ECF No. 50-44 at 4].  A TalentGuard employee, Raymond Ng, then emailed McEachern telling her that O'Sullivan had requested information about her 2020 self-review.  [Id. at 3].  Ng asked if they should direct O'Sullivan "to contact [her] directly, or if [McEachern would] like [them] to provide [O'Sullivan] with the requested information," noting that TalentGuard wanted to be "sure . . . [to be] respectful of [RogersGray's] data before releasing any details to [O'Sullivan] since she is on the 'Terminated Employees' list."  [Id.].  Ng also informed McEachern that a "full report" on O'Sullivan's self-review had not been generated because the evaluation had not been completed.  [Id.].  In response, McEachern directed Ng to "not release any information" until further notice from McEachern.  [Id. at 2].

In November 2021, RogersGray terminated its contract with TalentGuard.  [ECF No. 56 at 51, ¶ 101 [sic]].  After the termination of the contract, TalentGuard sent RogersGray a file via Dropbox that contained performance review data, but only included complete "reports," that is, performance reviews that were fully completed by both the employee and the reviewing manager.  [Id. at 51, ¶ 103 [sic]].  Because she had not completed her self-evaluation, Plaintiff's evaluation was not included in the Dropbox folder.  [Id. at 51, ¶¶ 103–05 [sic]].  Thereafter, TalentGuard permanently deleted all of RogersGray's data pursuant to the terms of the contract between the two companies and, as a result, O'Sullivan's incomplete self-evaluation has been lost.  [Id. at 52, ¶ 105 [sic]].[22]

---

[22] The parties dispute whether RogersGray made an adequate effort to ensure that the data maintained by TalentGuard concerning O'Sullivan's 2020 performance review was preserved. [ECF No. 56 at 52, ¶ 104 [sic]].

10.  <u>Asset Purchase Transaction Between RogersGray and BRP Group</u>

"On June 14, 2021, BRP Group and RogersGray entered into an asset purchase agreement ("Purchase Agreement") wherein the BRP Group purchased RogersGray's assets in exchange for cash and stock shares."  [ECF No. 50 ¶ 319].

**B.     Procedural History**

O'Sullivan filed her complaint on February 12, 2022.  <u>See generally</u> [Compl.]. Following discovery, on May 25, 2023, Defendants moved for summary judgment on all claims. [ECF No. 36].  O'Sullivan opposed on July 4, 2023, [ECF No. 49], and Defendants filed a reply on July 25, 2023, [ECF No. 55].

## II.  STANDARD OF REVIEW

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" <u>Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff</u>, 511 F.3d 216, 221 (1st Cir. 2007) (quoting Fed. R. Civ. P. 56(c)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  <u>Cochran</u>, 328 F.3d at 6.  "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."  <u>Id.</u> When reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  <u>Id.</u> The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial."  <u>Hannon v. Beard</u>, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material," <u>Gomez v. Stop & Shop Supermarket Co.</u>, 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory

allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6

(quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"To succeed in showing that there is no genuine dispute of material fact," the moving

party must point to "specific evidence in the record that would be admissible at trial." Ocasio-

Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively

produce evidence that negates an essential element of the non-moving party's claim,' or, using

'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable

to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124,

132 (1st Cir. 2000)). "One of the principal purposes of the summary judgment rule is to isolate

and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S.

317, 323–24 (1986). Once the movant takes the position that the record fails to make out any

trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts

sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33,

40 (1st Cir. 2013).

"'Even in employment discrimination cases where elusive concepts such as motive or

intent are at issue,' summary judgment is appropriate if the non-moving party rests 'merely upon

conclusory allegations, improbable inferences, and unsupported speculation.'" Benoit v. Tech.

Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (quoting Feliciano de la Cruz v. El Conquistador

Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)).

## III. DISCUSSION

O'Sullivan brings claims for sex discrimination pursuant to Title VII of the Civil Rights

Act of 1964, 42 U.S.C. 2000e, et seq. ("Title VII") (Count II); age discrimination pursuant to the

Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. (the "ADEA") (Count

III); and sex and age discrimination pursuant to Massachusetts General Laws, Chapter 151B, §

4(1) (Counts V and VI) (collectively, her "Discrimination Claims").  [Compl. ¶¶ 100, 103, 110,

113].  O'Sullivan also brings claims for retaliation under Title VII and Chapter 151B (Counts IV

and VII) and a common-law claim for wrongful termination in violation of public policy (Count

I).  [Id. ¶¶ 97, 107, 117].  Defendants seeks summary judgment on all claims, [ECF No. 37 at

12], and ask that the BRP Group be dismissed as a defendant, [id. at 26–30].

### A.  Discrimination Claims

In Counts II, III, V, and VI, Plaintiff alleges that Defendants discriminated against her

based on her gender and her age, when they (1) changed her position, and (2) terminated her

employment, in violation of Title VII, the ADEA, and Chapter 151B.  [Compl. ¶¶ 99–105, 109–

15].

In the absence of direct evidence of discrimination, as is the case here, discrimination

claims under all three statutes are analyzed under the three-step burden-shifting framework set

forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Mariani-Colón, 511 F.3d

at 221–23 (applying burden-shifting framework to Title VII claims of discrimination); Greenberg

v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995) (same as to the ADEA); Yee v. Mass. State

Police, 121 N.E.3d 155, 160 (Mass. 2019) (same as to Chapter 151B).

Pursuant to that framework:

> First, the plaintiff must make out a prima facie case of
> discrimination.  The burden then shifts to the defendant to present a
> legitimate, non-discriminatory reason, sufficient to raise a genuine
> issue of material fact as to whether it discriminated against the
> employee, for the employment decision.  Finally, the burden is
> placed on the plaintiff to demonstrate that the non-discriminatory
> reason is mere pretext and that the real reason was discrimination.

Quinones v. Buick, 436 F.3d 284, 289 (1st Cir. 2006) (citing McDonnell Douglas, 411 U.S. at

802–06).  "The burden of persuasion remains at all times with the plaintiff."  Mariani-Colón, 511

F.3d at 221; see also Abramian v. President & Fellows of Harvard Coll., 731 N.E.2d 1075, 1085

(Mass. 2000).

Defendants argue that O'Sullivan cannot make out a prima facie case because she cannot

establish that her change in role was an "adverse action" and that they are therefore entitled to

summary judgment.  [ECF No. 37 at 14–16].  Defendants also argue that, even assuming

O'Sullivan can establish a prima facie case, they had "legitimate, nondiscriminatory reason[s] for

changing Plaintiff's role, and subsequently terminating her," and there is no evidence in the

record "to suggest that RogersGray's reasons for changing [O'Sullivan's] role or ultimately

terminating her [were] pretexts for intentional discrimination based on her age or gender."  [ECF

No. 37 at 16–20].

    1.   Prima Facie Case: Adverse Action

For each of O'Sullivan's Discrimination Claims, to make out a prima facie case, she must

show that the Agency took an adverse employment action against her.[23]  Although Defendants

---

[23] See Stratton v. Bentley Univ., No. 22-cv-1061, 2024 WL 3823034, at *5 (1st Cir. Aug. 15, 2024) (As to Title VII claims, under the familiar burden-shifting framework outlined in McDonnell Douglas Corp. v. Green . . . [a plaintiff] must 'establish a prima facie case by showing that (1) she is 'a member of a protected class'; (2) she is 'qualified' for the job [from which she claims she was constructively discharged]; (3) she has 'suffer[ed] an adverse employment action at the hands of her employer'; and (4) there is 'some evidence of a causal connection between her membership in a protected class and the adverse employment action.'" (quoting Luceus v. Rhode Island, 923 F.3d 255, 258 (1st Cir. 2019) (alteration in original) (internal citation omitted)); Del Valle-Santana v. Servicios Legales De P.R., Inc., 804 F.3d 127, 129–30 (1st Cir. 2015) (For an ADEA claim, "plaintiff must first make out a prima facie case for age discrimination by showing that (i) she was at least 40; (ii) her work was sufficient to meet the employer's legitimate expectations; (iii) her employer took adverse action against her; and (iv) either younger persons were retained in the same position upon her termination or the employer did not treat age neutrally in taking the adverse action." (emphasis added) (citing Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 26 (1st Cir. 1998))); Yee, 121 N.E.3d at 160–61 ("[A] successful claim of employment discrimination [pursuant to Chapter 151(b)] requires a

do not challenge that O'Sullivan's ultimate termination was an "adverse employment action" for

purposes of her Discrimination Claims,[24] they argue that her alleged demotion does not similarly

qualify.  [ECF No. 37 at 14–16].

> "An 'adverse employment action' is one that affect[s] employment
> or alter[s] the conditions of the workplace."  The test for whether an
> employment action is adverse is whether it "materially change[s] the
> conditions of plaintiffs' employ."  The change "must be more
> disruptive than a mere inconvenience or an alteration of job
> responsibilities."

Burns v. Johnson, 829 F.3d 1, 10 (1st Cir. 2016) (first quoting Morales–Vallellanes v. Potter, 605

F.3d 27, 35 (1st Cir. 2010) (alterations in original); and then quoting Gu v. Bos. Police Dep't,

312 F.3d 6, 14 (1st Cir. 2002)).  To determine whether an employment action is materially

---

showing that the plaintiff has been subjected to some adverse action that is material" (quoting
King v. City of Bos., 883 N.E.2d 316, 324 (Mass. App. Ct. 2008))); id. ("The phrase 'adverse
employment action' does not appear in G. L. c. 151B, but we use the phrase to determine when
an act of discrimination against an employee 'in compensation or in terms, conditions or
privileges of employment' may be remedied under c. 151B.").

Because Defendants' motion, as Plaintiff points out, [ECF No. 49 at 17], only addresses the
adverse employment prong of the prima face standard, [ECF No. 37 at 14–16], Defendants have
waived any argument regarding the other elements, and the Court will focus its discussion only
on the adverse action element.  See Grajales v. P.R. Ports Auth., 924 F. Supp. 2d 374, 383
(D.P.R. 2013).

[24] Plaintiff's termination plainly qualifies as an adverse action for purposes of both her
Discrimination and Retaliation claims.  See Sensing v. Outback Steakhouse of Fla., LLC, 575
F.3d 145, 158 (1st Cir. 2009) (stating that "termination" is an adverse employment action);
MacCormack v. Bos. Edison Co., 672 N.E.2d 1, 8 (Mass. 1996) (stating adverse actions include
those that "disadvantage[] [an employee] in respect to salary, grade, or other objective terms and
conditions of employment"); Fournier v. Mass., No. 20-cv-02134, 2021 WL 4191942, at *3 (1st
Cir. Sept. 15, 2021) (stating that adverse employment actions include "demotions,
disadvantageous transfers, or refusals to promote," and noting that "the anti-retaliation
provisions of Title VII also cover employer actions that are materially adverse, specifically those
that are harmful enough to dissuade a reasonable employee from complaining about
discrimination").  Here, however, because the parties only dispute whether Plaintiff's changed
role was a discriminatory adverse employment action, see [ECF No. 37 at 14; ECF No. 49 at 17],
the Court only discusses O'Sullivan's claims in the context of that theory.

adverse, the Court "must engage in an objective, 'case-by-case inquiry.'" <u>Garmon v. Nat'l R.R. Passenger Corp.</u>, 844 F.3d 307, 314 (1st Cir. 2016) (quoting <u>Blackie v. Maine</u>, 75 F.3d 716, 725 (1st Cir. 1996)).

"To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment." <u>Muldrow v. City of St. Louis</u>, 601 U.S. 346, 347 (2024). Notably, a transferee need not show that the harm incurred was "significant." <u>Id.</u>; <u>see also</u> <u>Marrero v. Goya of P.R., Inc.</u>, 304 F.3d 7, 24 (1st Cir. 2002) ("Consistent with [Title VII's] broad statutory mandate, courts have rejected any bright line rule that a transfer cannot qualify as an 'adverse employment action' unless it results in a diminution in salary or a loss of benefits."). Ultimately, "[w]hether a reassignment constitutes an adverse employment action depends upon all of the circumstances viewed from 'the perspective of a reasonable person in the plaintiff's position.'" <u>Shaffer v. IEP Techs., LLC</u>, 557 F. Supp. 3d 191, 206 (D. Mass. 2021) (quoting <u>Billings v. Town of Grafton</u>, 515 F.3d 39, 53 (1st Cir. 2008)).

Here, there are significant factual disputes between the parties regarding the new role created for O'Sullivan, including whether she was to lose supervisory authority and other responsibilities as to the approximately forty employees who had previously reported directly to her, and whether the new role was "a 'dead end' sham position." [ECF No. 49 at 17; ECF No. 50 ¶¶ 75–80; ECF No. 56 ¶¶ 53–54; <u>see also</u> ECF No. 50-2 at 67:22–68:11]. That said, O'Sullivan has proffered facts that show that the role change was intended to, and in fact eventually did, revoke her supervisory duties. <u>See, e.g.</u>, [ECF No. 50-4 at 110:23–112:18; ECF No. 40-4 at 116–19]. Defendants frame this loss of duties as something Plaintiff "would no longer have to be responsible for," subsequently claiming that "a reasonable person in Plaintiff's position would have welcomed the change." [ECF No. 37 at 15]. However, "transferring an

employee to a less prestigious position" can be an adverse action, <u>Shaffer</u>, 557 F. Supp. 3d at 206, and courts have found that employees suffered adverse actions when a reassignment to a new role meant that they "no longer had the same supervisory responsibilities," <u>Olson v. Chao</u>, No. 17-cv-10970, 2019 WL 4773884, at *10 n.17 (D. Mass. Sept. 30, 2019) (rejecting defendant's argument that plaintiff's reassignment did not constitute a demotion because she received a salary increase).  In sum, the Court concludes a jury could find that the new role left Plaintiff "worse off," and thus constituted an adverse employment action.  <u>Muldrow</u>, 601 U.S. at 359.

2.    <u>Defendants' Articulated Legitimate, Non-Discriminatory Reason</u>

Because Plaintiff has made out a  prima facie case, "the burden of production — but not the burden of persuasion — shifts to [the employer], who must articulate a legitimate, non-discriminatory reason," <u>Theidon v. Harvard Univ.</u>, 948 F.3d 477, 495 (1st Cir. 2020) (quoting <u>Johnson v. Univ. of P.R.</u>, 714 F.3d 48, 53–54 (1st Cir. 2013)), and "produce credible [and admissible] evidence to show that that the reason advanced [for taking the adverse employment action] was the real reason," <u>Ríos-Jiménez v. Sec'y of Veterans Affs.</u>, 520 F.3d 31, 41 (1st Cir. 2008) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).

Defendants point to O'Sullivan's "ongoing issues with her communication style that created conflict with her peers" as a legitimate, non-discriminatory reason for creating her "new role . . . [and] reduc[ing] Plaintiff's responsibilities for people management," [ECF No. 37 at 16–17].  They also point to the fact that "the senior leadership team was looking to restructure the Commercial Lines business to address the significant growth and complexity of this part of its business," and that "[a]s a result of that evaluation, the decision was made to move [O'Sullivan] into a new role that would allow her to focus on strategic initiatives, so as to help manage the growth and future of the commercial lines business."  [<u>Id.</u> at 16].  Further, Defendants argue that

Plaintiff's "unhappiness about the change in her role" and "unwilling[ness] to move forward" were legitimate, non-discriminatory reasons for terminating her employment.  [Id. at 17].

The record is replete with O'Sullivan's history of, at least, perceived communication issues at RogersGray, see, e.g., [ECF No. 50-1 at 56:11–57:22, 116:19–118:3; 121:4–7; ECF No. 50-2 at 50:11–51:24, 99:2–24, 123:14–124:9; ECF No. 50-3 at 148:5–150:12, 199:24–201:16; ECF No. 50-4 at 257:1–15], and as O'Sullivan admits, "the purported reason for putting Plaintiff in the new role[] was to limit her need for communication,"[ECF No. 49 at 18].  Communication issues are valid, legitimate, and non-discriminatory reasons for either reassigning or terminating an employee.  See, e.g., López-López v. Robinson Sch., 958 F.3d 96, 110 (1st Cir. 2020) (affirming district court's finding that "[defendant]'s concern with the need for [plaintiff]'s improvement in her communication skills" was a legitimate, non-discriminatory reason for adverse action).[25]

Moreover, there is evidence that O'Sullivan had a negative attitude towards her new role, see, e.g., [ECF Nos. 40-39, 40-46, 40-49; ECF No. 50-4 at 275:12–15], and this can also be a legitimate, non-discriminatory reason for terminations.  See, e.g., Pryor v. Holiday Inns, Inc., 517 N.E.2d 472, 475 (Mass. 1988) (acknowledging that "general dissatisfaction with plaintiff's attitude and work performance" was a legitimate, non-discriminatory reason for termination); Palmer v. Albertson's LLC, 418 Fed. App'x 885, 888 (11th Cir. 2011) (uncooperative attitude considered legitimate, nondiscriminatory reason for plaintiff's termination); Adams v. Tenn. Dept. of Finance, 179 Fed. App'x 266, 274 (6th Cir. 2006) (inability to work with co-workers

---

[25] Plaintiff argues that a reasonable jury could conclude that Defendants believed "Plaintiff had a 'communication issue' because she is a woman."  [ECF No. 49 at 18].  The Court finds that this argument goes to pretext and is considered below.

deemed legitimate, nondiscriminatory reason for the defendant to take adverse action against plaintiff).

The Court therefore concludes that "Defendants have met their fairly light burden to establish a legitimate, non-discriminatory reason," for both O'Sullivan's reassignment and termination.  Sills v. Waddel & Reed, Inc., No. 08-cv-10314, 2009 WL 5943105, at *9 (D. Mass. Feb. 25, 2009).

### 3.    Pretext and Discriminatory Animus

Because "the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case," Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 161 (1st Cir. 1998), and "the burden shifts back to [Plaintiff]," Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc., 999 F.3d 37, 51 (1st Cir. 2021).  At this stage, Massachusetts law and Federal law diverge.

As to Title VII and the ADEA, "[a]t step three, to avoid summary judgment, [Plaintiff] must 'show by a preponderance of the evidence that [the employer's] proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory.'" Theidon, 948 F.3d at 496 (quoting Johnson, 714 F.3d at 54).  In other words, O'Sullivan needs "some minimally sufficient evidence, direct or indirect, both of pretext and of [Defendants'] discriminatory animus."[26]  Id. at 497 (second emphasis added) (quoting Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 40 (1st Cir. 2013)).

---

[26] Although Plaintiff asserts this statement of the law misinterprets Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000), this is the articulation of the final stage of the McDonnell Douglas burden shifting framework adopted by the First Circuit, see, e.g., Theidon, 948 F.3d at 497.

For Chapter 151B, "[b]ecause 'Massachusetts is a pretext only jurisdiction," to establish a claim for discrimination, O'Sullivan "need only present evidence from which a reasonable jury could infer that 'the[employer's] facially proper reasons given for its [adverse employment] action against [her] were not the real reasons for that action.'" Theidon, 948 F.3d 477 at 505 (quoting Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 33 (Mass. 2016)).

a.    Pretext

Reassignment.  O'Sullivan rebuts Defendants' purported reason for her reassignment by pointing to several occasions (both before the announcement that commercial lines would be re-organized and between the time of that announcement and her ultimate termination) when she was commended by her supervisors.  [ECF No. 49 at 20].  In her last evaluation, completed in January 2020, before she was informed of the reorganization plan, her then-supervisor, Schaaf, categorized her "Communication & Team Collaboration" at the level of "Sometimes Exceeds Expectations," and "Meets Expectations," even though Schaaf also noted Plaintiff's "abrupt" communications.  [ECF No. 40-4 at 94].  Furthermore, Plaintiff points to the fact that the job description shared with her in August 2020 required "[e]xceptional oral and written communication skills," and that the employee in that role must be able to engage in "collaboration with all levels across the organization," [ECF No. 50-13], and yet Defendants still reassigned her to that role, [ECF No. 50 ¶¶ 82–86].

Though this evidence is limited, it is not "merely . . . conclusory allegations, improbable inferences, and unsupported speculation.'" Benoit, 331 F.3d at 173 (quoting Feliciano de la Cruz, 218 F.3d at 5), and a jury could find that though Defendants may have had issues with O'Sullivan's communication style, they were not so significant as to warrant a change in her position.

Termination. O'Sullivan points to the award she received in spring of 2020 and Dave Robinson's follow-up congratulatory email to show that leading up to the time of her termination, Defendants were pleased with her job performance and not concerned with any negative attitude towards her new role.[27] [ECF No. 49 at 20]. The "Circle of Excellence" leadership award and Mr. Robinson's subsequent email on June 2, 2020, [ECF No. 56 at ¶¶ 60–61; ECF No. 40-29], could both be reasonably interpreted by a jury as evidence that RogersGray's leadership actually believed Plaintiff was a valued or even exceptional employee despite any unhappiness about her new role.[28]

The Court concludes there is thus a genuine dispute as to whether Defendants' proffered reason for O'Sullivan's reassignment was pretextual. Accordingly, the Court finds Plaintiff has established pretext as to her state law gender and age discrimination claims under the "pretext-only" standard applicable to Chapter 151B. Bulwer, 46 N.E.3d at 33.

b. Discriminatory Animus

As to gender, to meet the higher federal burden to show "discriminatory animus," Theidon, 948 F.3d at 497, Plaintiff points to two "comparator" employees with similar communication issues who were not reassigned or terminated. [ECF No. 49 at 9–10].[29] "A

---

[27] As Defendants argue, a reasonable jury could also infer that these actions were taken to placate Plaintiff. [ECF No. 55 at 8–9]. However, because a "fair-minded person could draw different inferences from the evidence presented . . . , the matter is for the jury." Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002).

[28] Although Defendants offer a plausible alternate explanation for the award, [ECF No. 50 ¶¶ 179–180], the Court must draw all reasonable inferences in favor of plaintiff. Cochran, 328 F.3d at 6. It is reasonable to infer that Defendants awarded O'Sullivan's leadership because she was performing her job at or above expectations.

[29] O'Sullivan also points to the comments of her executive coach as showing that her "alleged communication problem is really a gender problem." [ECF No. 49 at 19]. As further discussed below, the Court finds there is sufficient evidence to establish a genuine dispute as to

plaintiff in a disparate treatment case may attempt to show that 'others similarly situated to [her] in all relevant respects were treated differently by the employer.'" Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015) (quoting Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003)).  To determine whether comparators are similarly situated, courts "ask whether 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'"  Id. (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriqueños En Acción v. Hernández, 367 F.3d 61, 64 (1st Cir. 2004)).

Though Defendants correctly point out that there are some differences between O'Sullivan's communication issues and those of the comparators, [ECF No. 37 at 18–19, nn. 2–3], their communication styles are similar enough that the disparate treatment of the comparators suggests the possibility of "discriminatory animus" as to gender.  See, e.g., [ECF No. 50-23 at 2 ("There are times that [Carrick] gets frustrated and lets this frustration control how he interacts with others.  He can be short, curt, and this doesn't lead to productive conversations and progress."); ECF No. 50-2 at 162:21–22 ("In times of . . .  stress, pressure, chaos, [Carrick] could become . . . short with people face to face."); 169:23–170:8 ("Q. How was . . . Lopes' communication style? A. . . . a little mixed.  He went from excellent to . . . he could erupt a little bit on his worst day. . . . . he could be a little curt, maybe a little loud if you got him on his worst day.").  The evidence further shows that while these men received negative feedback like Plaintiff, their job titles or positions did not change.  [ECF No. 56 ¶ 48].  O'Sullivan has

---

discriminatory animus, regardless of whether Egan's statements can be attributed to RogersGray and are evidence of discriminatory animus.  The Court therefore does not address the parties' arguments on this point.

therefore established a genuinely disputed issue as to "discriminatory animus," with respect to her federal gender discrimination claim.[30]

On her federal age discrimination claim, O'Sullivan shows "discriminatory animus" first through evidence that Defendants replaced her with a woman fifteen years her junior, who had significantly less relevant experience than she did. [ECF No. 56 ¶¶ 33–34; ECF No. 49 at 7–8]. Plaintiff also points to a spreadsheet created by employees of RogersGray in September 2020,

---

[30] Defendants make a number of other unavailing arguments to assert that O'Sullivan cannot show pretext: (1) O'Sullivan was hired to replace a fifty-five year old man; (2) her communication issues were well-documented and had real impacts; (3) RogersGray had every right to change her role; (4) Defendants did not terminate O'Sullivan when they had an "opportunity" to do so; (5) Defendants wanted to keep O'Sullivan on in some way; (6) the same person who hired her also made the decision to fire her; (7) those who decided to take the alleged adverse employment actions against her were of the same protected classes as Plaintiff. [ECF No. 37 at 18–20].

First, the age and gender of the person O'Sullivan was hired to replace is of no consequence here; the question is whether Plaintiff can sufficiently establish a causal connection between her status as a member of protected classes and the adverse actions, not her hiring. Second, that her communication style caused issues has been acknowledged by the Court in recognizing that Defendants have proffered a legitimate, non-discriminatory reason for the adverse actions. See supra. Third, as Defendants well know, they did not have an unrestricted right to change the terms and conditions of her employment. See 42 U.S.C. § 2000e-2 (a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin"). Fourth and fifth, the fact that Defendants decided to continue to employ Plaintiff and wanted to keep her on in some way could show that O'Sullivan was a good employee and thus could actually support a finding that Defendants' stated legitimate, non-discriminatory reason for the reassignment was pretextual. See Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002). Sixth, the parties dispute who actually hired Plaintiff, and as such, Defendant is not entitled to the benefit of a "same-actor" inference at this stage. See [ECF No. 56 ¶ 2]. Lastly, while some members of Plaintiff's protected class were involved in her termination decision, members of the same protected class can discriminate against each other. Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 78 (1998) ("[I]n the . . . context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race." (citing Castaneda v. Partida, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."))).

and known to those involved in the decision to terminate plaintiff, including Reilly, that listed the ages of employees in the Commercial Lines division.  [ECF No. 56 ¶ 35].

Viewing this evidence "in the light most favorable to the [Plaintiff,] . . . draw[ing] all reasonable inferences in favor of the same," Chadwick v. WellPoint, Inc., 561 F.3d 38, 41 (1st Cir. 2009), a jury could reasonably infer that Plaintiff's age was a "but-for" cause of her reassignment and termination.  See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009); Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 145 (1st Cir. 2012) (noting that "'deployment of younger replacements' may be considered as probative, circumstantial evidence of age discrimination" (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991)); Gerlib v. R.R. Donnelley & Sons Co., No. 95-cv-7401, 2002 WL 1182434, at *4 (N.D. Ill. June 3, 2002) (stating that lists with employees' ages "may not, by themselves, be enough to prove discrimination, [but ruling that] as part of the larger circumstantial evidence picture, the lists are admissible"); Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009) ("Evidence establishing a prima facie case, in combination with evidence of pretext, can be sufficient to defeat summary judgment if a rational factfinder could conclude that unlawful age discrimination was the actual, but-for cause of the discrimination.").  Thus, albeit barely, O'Sullivan has established a genuine issue of dispute as to her age discrimination claim.  Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) ("Where . . . the nonmoving party has produced more than [conclusory allegations, improbable inferences, and unsupported speculation], trial courts 'should use restraint in granting summary judgment where discriminatory animus is in issue.'" (quoting DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).  Accordingly, the Court finds that O'Sullivan has adduced enough evidence as to her federal age discrimination claim to survive summary judgment.

Because O'Sullivan has met her burden to establish an adverse action and that
Defendants' legitimate, non-discriminatory reasons for her reassignment and termination were
pretexts to mask discriminatory animus, Defendants' motion for summary judgment is <u>DENIED</u>
as to Counts II, III, V, and VI.

### B. Retaliation Claims

In Counts IV and VII, O'Sullivan alleges that Defendants terminated her in December
2020 in retaliation for her complaining of "gender bias" [Compl. ¶¶ 106–08, 116–18], in the self-
evaluation portion of her 2020 performance review,[31] which is protected conduct under Title VII
and Chapter 151B. [<u>Id.</u> ¶¶ 84, 107, 117; ECF No. 49 at 26–27].

Retaliation claims under Chapter 151B and Title VII are also analyzed under the
<u>McDonnell Douglas</u> burden-shifting framework. <u>See</u> <u>Mariani-Colon</u>, 511 F.3d at 223; <u>Verdrager</u>
<u>v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.</u>, 50 N.E.3d 778, 800 (Mass. 2016).
Defendants argue that O'Sullivan cannot establish a prima facie case of retaliation because she
has not shown that Defendants knew that she had engaged in protected activity, and thus cannot
establish a causal connection between her complaint of gender discrimination and her
termination. [ECF No. 37 at 20–21].[32] Additionally, Defendants contend that O'Sullivan has
failed to establish that RogersGray's reason for terminating her was pretextual. [<u>Id.</u> at 21–22].

#### 1. Prima Facie Case: Causation and Knowledge of Protected Conduct

To establish a prima facie case of retaliation "under either statute, 'a plaintiff must show
that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii)

---

[31] O'Sullivan's 2020 self-evaluation reads in part: "I have been judged harshly for my
communication style because I am direct; I attribute this judgment to gender bias." [ECF No.
50-36 at 4].

[32] Defendants do not dispute that Plaintiff "engaged in protected activity by referencing gender
bias in her 2020 self-evaluation." [ECF No. 37 at 21].

the two were causally linked.'" <u>Xiaoyan Tang v. Citizens Bank, N.A.</u>, 821 F.3d 206, 218–19 (1st Cir. 2016) (quoting <u>Noviello v. City of Bos.</u>, 398 F.3d 76, 88 (1st Cir. 2005)).

"[An] inference of causation may be appropriate where there is close temporal proximity between protected activity and an adverse action." <u>Stratton</u>, 2024 WL 3823034, at *11 (citing <u>Pomales v. Celulares Telefonica, Inc.</u>, 447 F.3d 79, 85 (1st Cir. 2006)). As Defendants point out, however, "[i]n order to draw such an inference, . . . 'there must [also] be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action.'" <u>Planadeball v. Wyndham Vacation Resorts, Inc.</u>, 793 F.3d 169, 177 (1st Cir. 2015) (quoting <u>Pomales v. Celulares Telefónica, Inc.</u>, 447 F.3d 79, 85 (1st Cir. 2006)); <u>Velazquez-Ortiz v. Vilsack</u>, 657 F.3d 64, 72 (1st Cir. 2011) ("Where the evidence shows . . . that the decisionmaker knew of the complainant's protected conduct at the time the adverse employment action was taken, causation may be inferred from a very close temporal relationship between the protected activity and the adverse action."); <u>Calero-Cerezo v. United States Dep't of Just.</u>, 355 F.3d 6, 26 (1st Cir. 2004) (holding one-month temporal proximity is sufficient to establish causation at the prima facie stage).

Here, there were three weeks between O'Sullivan submitting her complaint of gender discrimination and her termination, which she suggests is sufficient to infer causation.[33] [ECF No. 49 at 27]. Defendants reply that O'Sullivan cannot establish a prima facie case because she cannot show that any of the three individuals involved in Plaintiff's termination, David Robinson, Jeff Reilly, and Allison McEachern, knew about her complaint prior to her termination. [ECF No. 37 at 21]. O'Sullivan, in turn, responds that (1) viewing all evidence in

---

[33] Plaintiff submitted her self-evaluation on November 14, 2020, [ECF No. 56 ¶ 88], and was terminated on December 3, 2020, [ECF No. 50 ¶ 281].

the light most favorable to her and making all reasonable inferences in her favor, a reasonable jury could infer that Defendants had seen or otherwise had knowledge of her complaint; and (2), alternatively, she is entitled to an adverse inference that those who were involved in the termination decision had seen her complaint due to Defendant's spoliation of the data showing who actually accessed her self-evaluation and when. [ECF No. 49 at 27–29].

As an initial matter, the Court observes that a close temporal proximity between the protected conduct and the adverse action, as here, may be sufficient to establish causation. Cherkaoui v. City of Quincy, 877 F.3d 14, 28–29 (1st Cir. 2017) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001))); see also Rios v. Centerra Grp. LLC, 106 F.4th 101, 120 (1st Cir. 2024) (suggesting that a "two-month temporal gap" in the absence of other causation evidence presented a "close question" as to whether Rios has made out a prima facie case of retaliation).

That said, for present purposes, the Court need not decide that question because, based on the evidence before it, O'Sullivan is entitled to an adverse spoliation inference and therefore has made out a prima facie retaliation case.

The evidence shows that the TalentGuard system was set up so that O'Sullivan's then-supervisor, Reilly, would receive an automatic notification each time a direct report submitted a self-evaluation. [ECF No. 56 at 43, ¶ 80 [sic]]. These automatic emails contained the subject line "Employee Submission notification" and provided a link for the manager to view the information submitted by the employee. [Id. at 43, ¶ 81 [sic]]. Although the system did actually

35

generate and deliver several automatic emails, [id. 43, ¶ 82 [sic]], there is no direct evidence that Reilly actually viewed Plaintiff's self-evaluation between when she submitted it on November 14, 2020 and when she was terminated on December 3, 2020.  See [ECF Nos. 50-39; 50-41].

The evidence does, however, show that by August 2021 Defendants were aware that O'Sullivan had sought information regarding her self-evaluation, see [ECF No. 50-44 at 2], and that she had filed a retaliation complaint with the Massachusetts Commission Against Discrimination ("MCAD") based on her self-evaluation. [ECF No. 50-42 at 2].  Defendants also knew that O'Sullivan had submitted her self-evaluation, but that a full report had not been generated because the full evaluation was not completed, and that McEachern had instructed TalentGuard not to provide O'Sullivan with any information.  [ECF No. 50-44 at 2–3].  It is not disputed that the TalentGuard system contained audit trail data that would have shown who accessed O'Sullivan's performance review and when, [ECF No. 56 at 50, ¶ 100 [sic]], or that in November 2021, RogersGray terminated its contract with TalentGuard, [id. at 51, ¶ 101 [sic]], knowing that TalentGuard would delete all of RogersGray's data within thirty days after termination of the contract pursuant to the master services agreement between the two businesses, [id.].  After termination of the contract, TalentGuard, consistent with the contract, did in fact delete all of RogersGray's data but sent it a file containing performance review data for completed evaluations.  [Id. at 51, ¶¶ 101, 103 [sic]].  Because O'Sullivan's report was incomplete, all data pertaining to it was subsequently lost.  [Id. at 51–52, ¶¶ 103–05 [sic]].  Based on this evidence, O'Sullivan asks the Court to apply an adverse inference that her self-evaluation was viewed by Reilly and others involved in the decision to terminate Plaintiff's employment.  [ECF No. 49 at 29].

Though the issue of an inference regarding spoliation has not, to the Court's knowledge, been discussed by the First Circuit in the context of summary judgment,[34] other courts have created frameworks to apply in this circumstance. In <u>Wood v. Pittsford Cent. Sch. Dist.</u>, the Second Circuit reversed the district court's grant of summary judgment to an employer-defendant on a plaintiff's Title VII retaliation claim because "[it could not] foreclose the possibility of an adverse spoliation inference on [the] record." No. 07-cv-00892, 2008 WL 5120494, at *2 (2d Cir. Dec. 8, 2008). "In borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." <u>Id.</u> (quoting <u>Byrnie v. Town of Cromwell, Bd. of Educ.</u>, 243 F.3d 93, 107 (2d Cir. 2001)). For such an inference, Plaintiff must show "(1) relevant evidence is destroyed; (2) with culpability; (3) when the defendant was under a duty to preserve the evidence."[35] <u>Id.</u> (citing <u>Byrnie</u>, 243 F.3d at 109). In the employment context, "the duty to preserve can arise from [Equal Employment Opportunity Commission ("EEOC")] regulations." <u>Id.</u> (first citing 42 U.S.C. § 2000e-8(c); and then citing 29 C.F.R. § 1602.14).

While "some indication of bad faith" might ordinarily be required for spoliation inferences, <u>United States v. Montoya</u>, 844 F.3d 63, 68–69 (1st Cir. 2016), "where an 'employer

---

[34] <u>See</u> <u>Mu v. Omni Hotels Mgmt. Corp.</u>, 882 F.3d 1, 12–13 (1st Cir. 2018) (not reaching issue of spoliation (citing <u>Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.</u>, 692 F.2d 214, 217 (1st Cir. 1982) (Breyer, J.) ("When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him.")).

[35] This is similar in substance to the First Circuit's articulation of the spoliation standard. <u>See</u> <u>Booker v. Mass. Dep't of Pub. Health</u>, 612 F.3d 34, 46 (1st Cir. 2010) ("Before an adverse inference can arise, the sponsor of the inference must lay an evidentiary foundation, proffering evidence sufficient to show that the party who destroyed the document 'knew of (a) the claim (that is, the litigation or the potential for litigation), and (b) the document's potential relevance to that claim.'" (quoting <u>Testa v. Wal-Mart Stores, Inc.</u>, 144 F.3d 173, 177 (1st Cir. 1998))).

[is] required by law to retain the employee's records, bad faith that might otherwise be required need not be shown to permit an adverse inference; intentional destruction satisfies the mens rea requirement,'" Wood, 2008 WL 5120494, at *2 (quoting Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 383 (2d Cir. 2001)); see also Chubb Nat'l Ins. Co. v. BST Plumbing & Heating, Inc., No. 18-cv-11619, 2021 WL 4504697, at *5 (D. Mass. Sept. 30, 2021) ("'Spoliation is the intentional, negligent, or malicious destruction of relevant evidence' that a party had a duty to preserve." (citations omitted)).  EEOC regulations make clear that "[w]here a charge of discrimination has been filed . . . against an employer under [T]itle VII, . . . the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action."  29 C.F.R. § 1602.14.  The same duty exists under Massachusetts law for complaints made to the MCAD.  See 804 Mass. Code Regs. § 1.05(1) ("Upon notice of the complaint, parties shall preserve all manner and forms of information and documents that are or may lead to evidence relevant to the charge of discrimination.  Failure to so preserve may result in a rebuttable presumption concerning the evidence against the party failing to make such preservation.").  Here, although Defendants knew that O'Sullivan had initiated MCAD proceedings, that the data with TalentGuard was relevant to her claims, and that the data would be lost if they terminated their contract with TalentGuard, Defendants still terminated that contract and failed to ensure that the relevant data was preserved.  See infra.

As was the case in Wood, Defendants "appear[] to concede that the records were destroyed intentionally, in the sense that their destruction was not an accident."  See Wood, 2008 WL 5120494, at *2; see [ECF No. 56 at 49, ¶¶ 98–103, 105 [sic] (showing that Defendants understood that data would be lost through their termination of the contract with TalentGuard, and also knew that the Dropbox folder containing performance review data included only

compete reports, meaning it wouldn't have included O'Sullivan's 2020 performance review)].

Drawing all reasonable inferences in Plaintiff's favor, "[t]his is enough, at least for summary

judgment purposes," to create a factual issue of spoliation that should reach the jury.[36]  Wood,

2008 WL 5120494, at *2; see Parker v. Oliva, No. 18-cv-00779, 2020 WL 6081963, at *3 (N.D.

Ala. Oct. 15, 2020) ("At the summary judgment stage, the spoliation doctrine provides a basis

for denying a motion for summary judgment where there is sufficient probative evidence for a

jury to find an act of spoliation and to draw the inference derived from such an act." (quoting

Watson v. Edelen, 76 F. Supp. 3d 1332, 1343 (N.D. Fla. 2015))).

Construing this evidence in the light most favorable to O'Sullivan, the Court cannot

"foreclose the possibility of an adverse spoliation inference" and is therefore satisfied that

O'Sullivan has made out a prima facie retaliation case.  Wood, 2008 WL 5120494, at *2.

### 2.  Defendant's Legitimate, Non-retaliatory Reasons for Termination

To articulate a legitimate, non-retaliatory reason for her termination and rebut the prima

facie case of retaliation, Defendants cite the same reasons they cite to rebut her prima facie case

of discrimination discussed above – namely her communication issues and poor attitude toward

her new position.  [ECF No. 37 at 16, 21–22].  For the same reasons discussed supra, Defendants

have met their burden of production at this stage.

### 3.  Pretext

Relying on O'Sullivan's evidence of pretext in her discrimination claims, discussed supra

(the Circle of Excellence award, Robinson's June 2020 email, and the August 2020 job

description), [ECF No. 56 ¶ 60; ECF No. 50-3 at 175:13–19; ECF No. 40-29; ECF No. 40-4 at

---

[36] "The jury, of course, need not view the evidence in the light most favorable to [Plaintiff], and it may find that the discharge was not retaliatory.  On this record, however, the retaliation claim cannot be dismissed as a matter of law."  Wood, 2008 WL 5120494, at *3.

116–19], a jury could infer that RogersGray actually believed that she had accepted her change of role, was or that she had become a sufficiently adequate communicator, and was performing her job well (or even exceptionally well).  This therefore creates an issue of fact as to whether Defendants' non-retaliatory reasons for Plaintiff's termination—her communication issues and negative attitude toward her new position—were mere pretext.  See Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 118 (1st Cir. 2024) (Plaintiff must "'point to specific facts that would demonstrate' to a reasonable jury that [Defendant's legitimate, non-discriminatory reason] . . . was a 'sham or pretext intended to cover up [Defendant's] retaliatory motive.'" (quoting Calero-Cerezo, 355 F.3d 6 at 26 (1st Cir. 2004)); Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 50 N.E.3d at 800 ("The combination of a 'prima facie case' of retaliation with 'a showing of pretext' allows a jury to infer that there was no 'legitimate explanation for the adverse [employment] decision' and that the employer's true motivation was retaliatory.") (quotation marks omitted).

Accordingly, summary judgment as to Plaintiff's Title VII (Count IV) and Chapter 151B (Count VII) claims is DENIED.

### C.    Wrongful Termination Claims

Finally, in Count I, O'Sullivan claims she was terminated,[37] in part because she "opposed conduct by Defendant which she reasonably believed to be in violation of the DPPA and the

---

[37] "To succeed on a wrongful termination claim on any basis, one must be terminated by his or her employer, or suffer a constructive discharge."  DiLuca v. Commc'ns & Power Indus., Inc., No. 00-cv-02000, 2003 WL 21781564, at *7 (Mass. Super. Ct. July 28, 2003) (citing Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 533 N.E.2d 1368, 1370 (Mass. 1989)), aff'd on other grounds, 838 N.E.2d 622 (Mass. App. Ct. 2005).  Plaintiff has not argued nor does it appear that her role change constituted a constructive discharge.  GTE Prod. Corp. v. Stewart, 653 N.E.2d 161, 168–69 (Mass. 1995) (explaining in the context of a wrongful termination claim that "[a] single, isolated act of an employer (or an agent of the employer)

Massachusetts Surplus Lines Statute," and therefore contrary to Massachusetts public policy. [Compl. ¶¶ 95–98].[38]  Defendants argue that "Plaintiff's claim for wrongful termination in violation of public policy fails because (1) "any [causal] connection between [her] raising [unlawful activity] issues and her termination is utterly absent from th[e] record," [ECF No. 37 at 26], and (2) her allegations are too vague and ill-defined to trigger [any of] the narrow public policy exception[s] to the at-will employment rule," [id. at 22].

The default rule in Massachusetts is that "an employer may lawfully terminate a relationship with an at-will employee at any time — for any reason, for no reason, and even for a reason that might be seen by some as unwise or unkind." Murray v. Warren Pumps, LLC, 821 F.3d 77, 89 (1st Cir. 2016) (citing Upton v. JWP Businessland, 682 N.E.2d 1357, 1358–59 (Mass. 1997)).  There is, however, a "narrow [common law] exception . . . [that] protects at-will employees from terminations that conflict with sufficiently important and clearly defined public policies in Massachusetts."  Id. (citing King v. Driscoll, 638 N.E.2d 488, 493 (Mass. 1994)). "Thus far, the state's highest court has held that '[r]edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for

---

usually will not be enough to support a constructive discharge claim.  Thus, evidence of a single unfavorable performance review or even of a demotion generally will not be deemed sufficient to support a claim."); see generally [Compl.; ECF No. 49]. As such, the Court's analysis focuses solely on the circumstances surrounding Plaintiff's termination on December 3, 2020.  [ECF No. 50 ¶ 281].

[38] Specifically, Plaintiff alleges that she was wrongfully terminated for: (1) raising concerns internally that the RogerGray's Commercial Lines sales team had violated the DPPA by asking the service team for confidential motor vehicle driving records and passing them along to RogerGray clients for use in their employment decisions; and (2) raising concerns internally that the sales team was violating the Massachusetts Surplus Lines Statute by not making "diligent efforts" to place surplus lines first with admitted carriers, and then by not filing affidavits affirming that such "diligent efforts" were made (collectively her "whistle-blowing activities"). See [Compl. ¶¶ 46–60]; see also [ECF No. 49 at 22–24].

doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law

forbids (e.g., committing perjury).'" Id. (quoting Smith-Pfeffer, 533 N.E.2d at 1371).  Similarly,

an employee may not be terminated for either "cooperating with an ongoing criminal

investigation," Meehan v. Med. Info. Tech., Inc., 177 N.E.3d 917, 920 (Mass. 2021) (citing

Flesner v. Tech. Commc'ns Corp., 575 N.E.2d 1107, 1111 (Mass. 1991)), or making "an internal

complaint . . . about . . . alleged violation[s] of the criminal law," Shea v. Emmanuel Coll., 682

N.E.2d 1348, 1350 (1997).  Beyond these, redress may also be available "for employees

terminated for performing important public deeds, even though the law does not absolutely

require the performance of such a deed." Meehan, 177 N.E.3d at 922 (quoting Flesner, 575

N.E.2d at 1111).  "Whether there is a sufficiently defined public policy is a matter of law for the

court to determine." Simas v. First Citizens' Fed. Credit Union, 63 F. Supp. 2d 110, 114 (D.

Mass. 1999).

Assuming for the moment that claims based on the activities as reported by O'Sullivan

would qualify for a public policy exception to the at-will employment doctrine, it is her burden

to establish a causal connection between this conduct and her ultimate termination on December

3, 2020. Elliott-Lewis v. Abbott Labs., Inc., 411 F. Supp. 3d 195, 209–10 (D. Mass. 2019)

(requiring wrongful termination plaintiff to show her "rais[ing] [of] specific concerns" was

ultimately a "cause of her termination" at the summary judgment stage (citing Robert Reiser &

Co. v. Scriven, 130 F. Supp. 3d 488, 497 (D. Mass. 2015))).  To establish this causal connection,

O'Sullivan primarily relies on the temporal proximity between the date that she raised her

concerns and the date on which she was terminated.  [ECF No. 49 at 25–26].  Because

O'Sullivan raised her concerns about DPPA violations several years prior to her termination,

[ECF No. 50 ¶ 308; ECF No. 50-5 ¶ 8], and about the Surplus Lines Statute violations at least

eleven months before her termination,[39] [Compl. ¶ 54; ECF No. 56 ¶ 13; ECF No. 50-5 ¶ 13], the

time gaps between either whistle-blowing activity and her termination are simply too great for a

jury to reasonably infer a causal connection based solely on a temporal connection.  See Pena v.

Honeywell Int'l, Inc., 923 F.3d 18, 32 (1st Cir. 2019) (finding four-month temporal proximity

"not [even] 'very close'" to sufficiently establishing causality in the context of an ADA

retaliation claim); Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) ("Without some

corroborating evidence suggestive of causation . . . a gap of several months cannot alone ground

an inference of a causal connection between a complaint and an allegedly retaliatory action.").[40]

Beyond temporal proximity, O'Sullivan asserts that the proffered evidence allows for a

reasonable jury to conclude that she was terminated because of her whistle-blowing activities.

[ECF No. 49 at 25].  In her view, because Defendants terminated Plaintiff in part because of her

poor relationship with the sales team, and because her poor relationship with the sales team was,

---

[39] The exact date O'Sullivan raised concerns about the Surplus Lines Statute is not clear from the record evidence, and the parties dispute when O'Sullivan actually raised these concerns, but taking the evidence in the light most favorable to Plaintiff, the Court assumes from her claim that she raised concerns "[i]n mid-2019 and continuing into the Fall of that year," to mean that she raised concerns in December 2019, at the latest.  [ECF No. 50-5 ¶ 13].

[40] Plaintiff also argues that because Defendants began interviewing Tawa in "[l]ate November 2019," a "jury could infer that the decision to hire Tawa was made shortly after O'Sullivan's protected activity concerning surplus lines," allowing for an even closer temporal proximity and stronger inference of causation.  [ECF No. 49 at 25–26].  She further asserts that this would also allow a "jury [to] infer that Strategus's decision to hire Tawa was part of a 'package deal' with its termination [of Plaintiff]."  [Id. at 26].  While this two-step series of inferences is theoretically possible, it does not carry the day where Plaintiff cites no record evidence to suggest that the ultimate goal of Plaintiff's new role and Tawa's hiring was to eventually terminate Plaintiff completely.  The case Plaintiff cites in support of this argument is inapposite because the plaintiff there had direct evidence that the defendant had discriminatory animus at the time the plaintiff was initially transferred or demoted — as marked by the employer's contemporaneous statement that "[he] want[ed] a younger man."  Brownlie v. Kanzaki Specialty Papers, Inc., 691 N.E.2d 953, 956 (Mass. App. Ct. 1998).  Here, O'Sullivan proffers no direct evidence of retaliatory animus on the part of Defendants at the time her new role was announced.

at least in part, because of her whistle-blowing activities aimed at stopping members of that team from violating state law, Defendants termination of Plaintiff was attributable to her whistle-blowing activities.  [ECF No. 49 at 25].  This largely speculative supposition, however, is supported only by Plaintiff's own deposition testimony where she states her subjective belief that her whistle-blowing activities were "a factor in [her termination]," because she "had received criticism [in performance reviews] that my interactions with the Producers were – I caused, you know, some stress, whatever."  [Id.; ECF No. 50-17 at 5:17–7:9].

The Court agrees that the performance reviews in question show a history of conflict between O'Sullivan and the sales team members, see supra, but neither Plaintiff's subjective opinion nor these performance reviews suggest that Plaintiff's issues with the sales team were caused by her raising concerns about the surplus lines and the DPPA.  See Elliott-Lewis, 411 F. Supp. 3d at 209–10.  Because Plaintiff has failed to show a causal connection between her whistle-blowing activities and her termination, Plaintiff cannot establish the required causation element of her wrongful termination claim.  As a result, the Court need not reach the issue of whether Plaintiff's conduct qualifies for the public policy exception.

Accordingly, summary judgment is GRANTED as to Count I.

**D.  Dismissal of BRP Group**

Lastly, Defendants argue that the BRP Group should be dismissed as a defendant because O'Sullivan has failed carry her burden to justify the imposition of successor liability on the BRP Group, which acquired RogersGray via the Purchase Agreement in July 2021.  [ECF No. 37 at 27].

It is undisputed that in the Purchase Agreement, the "BRP Group specifically disclaimed liability for this litigation and did not acquire liability for the causes of action" in this case.  [ECF

44

No. 50 ¶ 320]. Plaintiff therefore has the burden of establishing "an exception to the 'general

rule of no successor liability.'" CSX Transp., Inc. v. Tri Cty. Recycling, No. 18-cv-12095, 2019

WL 3225754, at *5 (D. Mass. July 17, 2019) (quoting Nat'l Gypsum Co. v. Cont'l Brands Corp.,

895 F. Supp. 328, 336 (D. Mass. 1995)). Defendants maintain that Massachusetts law on

successor liability controls here and calls for application of the standard articulated in Cargill,

Inc. v. Beaver Coal & Oil Co., Inc., 676 N.E.2d 815 (Mass. 1997). [ECF No. 37 at 26–30; ECF

No. 55 at 10–13]. In Cargill, the Supreme Judicial Court explained:

> We adhere to traditional corporate law principles that the liabilities of a selling
> predecessor corporation are not imposed on the successor corporation which
> purchases its assets unless (1) the successor expressly or impliedly assumes liability
> of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the
> successor is a mere continuation of the predecessor, or (4) the transaction is a
> fraudulent effort to avoid liabilities of the predecessor.

Cargill, 676 N.E.2d at 818. Defendants maintain that none of these exceptions apply here.

In a brief, several sentence-paragraph, O'Sullivan responds that a less stringent, federal

common law standard applies in the employment context, the factors of which are all met here.

[ECF No. 49 at 31]. Under Plaintiff's proposed standard, the so-called "successor employer

doctrine," EEOC v. Roark-Whitten Hosp. 2, LP, 28 F.4th 136, 147 (10th Cir. 2022), "a court

should consider three principal factors before making a successor liability determination: (1)

continuity in operations and work force of the successor and predecessor employers; (2) notice to

the successor employer of its predecessor's legal obligation; and (3) ability of the predecessor to

provide adequate relief directly," EEOC v. Preferred Labor LLC, No. 06-cv-40190, 2009 WL

415429, at *2 (D. Mass. Feb. 13, 2009) (quoting Rego v. ARC Water Treatment Co., 181 F.3d

396, 402 (3d Cir. 1999)). Regardless of the standard applied, "a determination of whether a

predecessor corporation continues to exist for purposes of successor liability is wholly fact

specific." Cruz v. Bos. Litig. Sols., No. 13-cv-11127, 2015 WL 12952702, at *5 (D. Mass. July

1, 2015) (applying <u>Cargill</u> factors) (quoting <u>Milliken v. Duro Textiles, LLC</u>, 451 Mass. 547, 559

(2008)); <u>Trujillo v. Longhorn Mfg. Co.</u>, 694 F.2d 221, 225 (10th Cir. 1982) (explaining in the

context of the successor employer doctrine, that "the 'nature and extent of [successor] liability is

subject to no formula, but must be determined upon the facts and circumstances of each case.'"

(quoting <u>Equal Empl. Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.</u>, 503 F.2d

1086, 1092 (6th Cir. 1974)).  Here, even assuming the more relaxed successor employer doctrine

applies to both the federal and state law claims,[41] the Court concludes that Plaintiff has failed to

establish a genuine issue of material fact.

---

[41] Although Defendants assert that courts in the First Circuit "continue[] to apply the [four-factor] standard articulated in <u>Cargill</u>, including in employment law cases," [ECF No. 55 at 11], this Court is not aware of, and Defendants have not directed the Court to any relevant First Circuit case law addressing this issue in the employment context.  Other sessions of this Court have applied both the <u>Cargill</u> standard and Plaintiff's proposed more relaxed standard.  <u>Compare Cruz</u>, 2015 WL 12952702, at *6 (applying the <u>Cargill</u> factors to determine whether plaintiff's added federal and state law employment discrimination claims in an amended complaint were futile or not), <u>with</u> <u>Preferred Labor LLC</u>, 2009 WL 415429, at *2 (applying the three-factor test articulated by Plaintiff here to determine whether summary judgment was appropriate on plaintiff's federal employment discrimination claims).

There is abundant out-of-circuit case law discussing the development of O'Sullivan's proposed standard, the "successor employer doctrine," and the reasons to apply a lesser standard than the common law standard articulated in <u>Cargill</u> in the employment context.  As the Tenth Circuit recently explained: "In the 1960's, federal courts began recognizing 'that th[is] general common law rule of nonliability on the part of successors [wa]s too harsh to employees for application in the context of discrimination in employment, and that the traditional common law exceptions to the nonliability rule insufficiently ease[d] the harshness.'"  <u>Roark-Whitten Hosp. 2, LP</u>, 28 F.4th at 147 (quoting <u>Wheeler v. Snyder Buick, Inc.</u>, 794 F.2d 1228, 1237 (7th Cir. 1986)).  Thus, many circuits have adopted or endorsed application of a more relaxed standard in the employment context.  <u>See, e.g.</u>, <u>id.</u>; <u>EEOC v. N. Star Hosp., Inc.</u>, 777 F.3d 898 (7th Cir. 2015); <u>Prince v. Kids Ark Learning Ctr., LLC</u>, 622 F.3d 992 (8th Cir. 2010); <u>Brzozowski v. Corr. Physician Servs.</u>, 360 F.3d 173 (3d Cir. 2004); <u>In re Nat'l Airlines</u>, 700 F.2d 695 (11th Cir. 1983); <u>Rojas v. TK Commc'ns.</u>, 87 F.3d 745 (5th Cir. 1996); <u>N.Y. State v. C&S Wholesale Grocers, Inc.</u>, 24 F.4th 163 (2d Cir. 2022).

Although a determination of this issue is not warranted or made by the Court in the instant case, it is likely that this standard would apply in a situation such as this, where Plaintiff has brought both federal and state employment discrimination claims, because the Massachusetts Supreme

1.   Continuity of Business Operations

To determine whether there is "continuity of operations" and work force between two entities, courts evaluate "(1) whether the same employees and management are in place; (2) whether the same product or service is produced or offered; (3) whether the same facility and equipment is in use; and (4) whether the same method of production or operation is followed." Preferred Labor LLC, 2009 WL 415429, at *3 (citing MacMillan, 503 F.2d at 1094).

As to the first factor, O'Sullivan disputes that "[t]he entire management structure of RogersGray changed" as a result of the asset purchase, [ECF No. 50 ¶ 327], pointing to an organizational chart, [ECF No. 50-48 at 13–14],[42] which she contends "shows no material difference" to the previous management team structure, [ECF No. 50 ¶ 327].  The new organizational structure depicts Mike as the Regional BRP RG Chairman and Dave as the Regional BRP RG CEO, with many of their former subordinates, including McEachern and Lopes, directly reporting to them.  [ECF No. 50-48 at 13].  Mike and Dave's titles suggest, and Mike's deposition testimony confirms, see [ECF No. 50-3 at 7:22–8:5, 12:6–7], however, that they now report directly to BRP, which constitutes a change in management.  Moreover, it is undisputed that "[a]s a result of the transaction, none of the officers or directors of RogersGray became officers or directors of BRP Group."  [ECF No. 50 ¶ 325].  In fact, "RogersGray's board

_____

Judicial Court has repeatedly stated,"[i]t is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G. L. c. 151B."  Wheatley v. Am. Tel. & Tel. Co., 636 N.E.2d 265, 268 (Mass. 1994); see also Glob. NAPs, Inc. v. Awiszus, 930 N.E.2d 1262, 1276 (Mass. 2010) ("We have often applied Federal case law interpreting cognate Federal antidiscrimination statutes when looking to interpret G. L. c. 151B."); Mass. Bay Transp. Auth. v. Mass. Comm'n Against Discrimination, 879 N.E.2d 36, 44 (Mass. 2008) ("[W]e consider Federal case law construing Title VII in interpreting G. L. c. 151B, § 4 (1A).").

[42] Plaintiff does not provide a pincite when referencing the organizational chart, but the Court assumes that Plaintiff is referring to pages 13–14, given that those pages describe the roles of the Robinson brothers.

of directors was dissolved [and n]o board seats or corporate titles were awarded by BRP Group to RogersGray's principals as a result of the asset purchase."  [Id.].  The Court is thus not satisfied that Plaintiff established a genuine issue of material fact under the first factor.

Several undisputed facts support a finding that factor two is satisfied.  It is undisputed that "[s]ince the Acquisition, BRP Group has continued to conduct the business of RogersGray under the name 'RogersGray A Baldwin Risk Partner,' and using the web domain 'www.rogersgray.com.'" [ECF No. 56 at 53, ¶ 107 [sic]].  It is similarly undisputed that "[s]ince the Acquisition, RogersGray has provided substantially the same kind of goods and services, to substantially the same customer population, as it did prior to the Acquisition." [Id. at 53, ¶ 109 [sic]].  That said, because Plaintiff proffers no evidence as to factors (3) and (4), the Court cannot find that Plaintiff has established a genuine issue of material fact as to the first prong of a successor liability determination.

      2.   Notice

This factor is easily satisfied, as it is undisputed that "BRP was aware that Ms. O'Sullivan claimed to have been discriminated against by RogersGray with respect to the terms and conditions of her employment, and had threatened to bring claims for relief."  [ECF No. 56 at 53, ¶ 110 [sic] 107 [sic]].

      3.   Ability of the Predecessor to Provide Adequate Relief

Even assuming that O'Sullivan has established a genuine issue of material fact as to whether there is "continuity of operations" and work force between the two entities,[43] Defendants argue that she still cannot meet her summary judgment burden since she cannot show

---

[43] It is undisputed that BRP Group had notice of O'Sullivan's claims.  [ECF No. 56 at 53, ¶ 110 [sic] 107 [sic]].

that the former entity and original employer "no long[er] has sufficient assets to pay [the] monetary damages [sought]." Preferred Labor LLC, 2009 WL 415429, at *4; see [ECF No. 55 at 11]. To support her assertion that RogersGray does not have the ability to grant her prayer for relief, here only monetary damages, [Compl. at 23–24], O'Sullivan directs the Court to the Purchase Agreement itself, [ECF No. 56 at 54, ¶ 111 [sic] 108 [sic].[44] While the pages of the agreement cited by Plaintiff establish that one hundred percent of *some* of RogersGray's assets were sold to the BRP Group, the document also shows that there is a list of "Excluded Assets" to be kept by RogersGray following the transaction. [ECF No. 39-1 at 6]. These excluded assets included "all insurance policies," [id.], among them "an employment practices liability (EPLI) 'tail' insurance policy," that RogersGray was contractually required to maintain, [id. at 48]. Furthermore, the agreement shows that the "Buyers," which included the BRP Group, [id. at 5], gave a sum of "Closing Cash" to the "Sellers," which included RogersGray as consideration for the sale of assets, [id. at 8].[45] As O'Sullivan has failed to show that either the insurance policy or the closing cash would be insufficient to cover the money damages asserted by her claims, see generally [ECF Nos. 49, 50, 56], she has not created a genuine issue of fact regarding BRP's successor liability. See also Preferred Labor LLC, 2009 WL 415429, at *5 (holding where plaintiff admits that an original entity "has sufficient assets from which to pay the monetary damages sought by the plaintiff," after entering into an asset purchase agreement with supposed

---

[44] Plaintiff cites to "Exhibit A, pp. 5–7" [ECF No. 56 at 54, ¶ 111 [sic] 108 [sic]], but Plaintiff's exhibits to her Statement of Additional Material Facts, [ECF No. 50], do not include an "Exhibit A." The Court assumes that the Exhibit referenced is [ECF No. 39-1], the Asset Purchase Agreement wherein the BRP Group acquired RogersGray's assets.

[45] Although the agreement appears to define the term "Closing Cash," [ECF No. 39-1 at 73], the definition has been redacted. Nonetheless, no evidence has been proffered to show that the amount would be insufficient to cover Plaintiff's damages.

successor entity, "no reasonable factfinder could conclude that successor liability should be imposed upon" the supposed successor entity).

Because O'Sullivan's only opposition to Defendants' contention relies on the application of the more relaxed standard, [ECF No. 49 at 31], and the Court has just determined that Plaintiff has failed to meet her burden even under that standard, the Court need not engage in an analysis of the Cargill factors.  See Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 19 (1st Cir. 2009) ("[I]ssues adverted to . . . in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned." (internal quotation marks and citation omitted)).

Accordingly, BRP Group is dismissed as a Defendant.

## IV.  CONCLUSION

Accordingly, Defendant's motion for summary judgment, [ECF No. 36], is GRANTED in relation to Count I, and DENIED as to Counts II, III, IV, V, VI, and VII.  Further, BRP Group is dismissed as a Defendant.


        **SO ORDERED.**

September 25, 2024                          /s/ Allison D. Burroughs
                                           ALLISON D. BURROUGHS
                                           U.S. DISTRICT JUDGE